1  TRACY L. WILKISON
   Acting United States Attorney
2  BRANDON D. FOX
   Assistant United States Attorney
3  Chief, Criminal Division
   JOSEPH T. MCNALLY (Cal. Bar No. 250289)
4  Assistant United States Attorney
        312 North Spring
5       Santa Ana, California 92701
        Telephone: (213) 894-2272
6       Facsimile: (213) 894-2500
        E-mail:    joseph.mcnally@usdoj.gov
7
   Attorneys for Plaintiff
8  UNITED STATES OF AMERICA

9                 UNITED STATES DISTRICT COURT

10           FOR THE CENTRAL DISTRICT OF CALIFORNIA

11 UNITED STATES OF AMERICA,        Nos. SA CR 09-248-DOC
                                         CV 20-2064-DOC
12          Plaintiff,
                                    GOVERNMENT'S OPPOSITION TO
13               v.                 DEFENDANT LEWELLYN COX'S MOTION
                                    FOR RELIEF PURSUANT TO 28 U.S.C.
14 LEWELLYN COX,                    § 2255; MEMORANDUM OF POINTS AND
                                    AUTHORITIES
15          Defendant.

16

17

18         Plaintiff United States of America, by and through its counsel

19 of record, the Acting United States Attorney for the Central District

20 of California and Assistant United States Attorney Joseph T. McNally,

21 hereby files its opposition to defendant Lewellyn Cox's motion for

22 relief pursuant to 28 U.S.C. § 2255.

23         This opposition is based upon the attached memorandum of points

24 and authorities, the files and records in this case, and such further

25 //

26 //

27

28

evidence and argument as the Court may permit.

Dated: February 11, 2021        Respectfully submitted,

                                TRACY L. WILKISON
                                Acting United States Attorney

                                BRANDON D. FOX
                                Assistant United States Attorney
                                Chief, Criminal Division

                                _____/s/_____
                                JOSEPH T. MCNALLY
                                Assistant United States Attorney

                                Attorneys for Plaintiff
                                UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

<u>DESCRIPTION</u>                                                                    <u>PAGE</u>

**Contents**

TABLE OF AUTHORITIES....................**Error! Bookmark not defined.**

MEMORANDUM OF POINTS AND AUTHORITIES................................1

I.    INTRODUCTION.................................................1

II.   STATEMENT OF FACTS..........................................2

          1.    The Bank Account Takeover Scheme.....................2

          2.    Conviction..........................................8

          3.    Additional Proceedings.............................10

          4.    Sentencing Proceedings.............................14

III.  LEGAL FRAMEWORK............................................25

IV.   THE MOTION MUST BE DENIED..................................30

      A.    There Was No Ineffectiveness Assistance of Counsel
            with Respect to Counsel's Handling of the Bacque
            Identification.............................................30

      B.    There Was No Ineffectiveness Assistance of Counsel
            with..............................................34

      Respect to Any Advice Provided Regarding 18 U.S.C. § 1029.....34

      Or a Sentencing Enhancement for Access Device Fraud..........34

      C.    Defendant's Sentencing Claim is Meritless...............35

      D.    Defendant's Rule 32 is Procedurally Barred and
            Meritless..............................................36

      E.    A Certificate of Appealability Should Not Issue.........37

V.    CONCLUSION.................................................37

i

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2

**I.   INTRODUCTION**

3   Defendant orchestrated a sophisticated bank fraud and identity

4   theft scheme over a multi-year period.  The evidence of his guilt was

5   overwhelming.  It included, among other things, intercepted calls

6   over wiretaps where he was discussing his efforts to steal from bank

7   accounts, recorded calls over bank customer service lines where he

8   impersonated bank account holders and ordered checks on their

9   accounts, and bank account holders' account information and forged

10   checks that were found at his home during search warrants.  In face

11   of overwhelming evidence, defendant pleaded guilty where he told the

12   Court under oath that he was pleading guilty because he was guilty.

13   Despite the overwhelming evidence of his guilt and his own

14   admissions to the criminal conduct, defendant has filed a section

15   2255 petition where he seeks to vacate his convictions.  In his

16   motion, defendant argues that his counsel was ineffective because he

17   failed to attack a faulty six-pack identification by Jessica Bacque

18   and misadvised him on the applicability of an access device charge

19   and sentencing enhancement.  Defendant also argues that the court

20   erred in calculating the loss amount and failed to permit him to

21   allocute.  These claims fail.  As the court found during pre-trial

22   and sentencing proceedings, defense counsel provided effective

23   representation.  Counsel challenged the six-pack identifications that

24   defendant claims were flawed and the court ultimately resolved the

25   issue by not relying on them in imposing sentence.  Even assuming

26   defendant's allegation that counsel misadvised him on the

27   applicability of an access device charge and sentencing enhancement,

28   it did not impact the voluntariness of his guilty plea because he had

no plea agreement with the government and the court advised defendant that there were no promises with respect to his sentence. Defendant's sentencing claims are frivolous.  The Court held a four day sentencing hearing and concluded that the loss calculations were overwhelmingly supported by the evidence.  Defendant's claim that the Court violated Rule 32 because it did not permit allocution is procedurally barred because he did not raise the claim on direct appeal and entirely contradicted by the record.  Finally, any claims that defendant did not raise on direct appeal, with the exception of ineffective assistance of counsel, are procedurally barred.

**II.   STATEMENT OF FACTS[1]**

      1.   <u>The Bank Account Takeover Scheme</u>

Defendant, a career identity thief who has not had legitimate employment since 2001, led a massive identity theft/bank account takeover ring that operated from 2005 to February 2011, when a search warrant was executed at defendant's residence.  (ER 637-41; GER 592-657; PSR ¶¶ 121-68, 207.)  Through a variety of means, defendant and his co-conspirators stole the identities of checking account holders at various banks and then drained the accounts, diverting the money for their own use.  (ER 637-41.)

Defendant was "at the top" of this conspiracy.  (GER 59, 162.) Defendant was the one in control of victim account information.  (GER 59, 162.)  He had detailed information in his home for over 193

---

[1] The record in this case is voluminous.  The government's citations are to the excerpts of record filed in connection with defendant's appeal.  ER refers to defendant's excerpt of record and GER refers to the government's excerpts of records.  Both have been filed as exhibits to the government's opposition.  The government can provide the ER and GER in hard copy binder form if helpful to the Court.

victims—including victim names, account numbers, social security numbers, mothers' maiden names, dates of birth, driver's license numbers, and telephone service providers.  (GER 148-49; *see also* GER 67, 81-85, 160-61.)

Defendant collected this information from multiple sources. Some of it came from one of his co-defendants, Angus Brown (also known as "Homicide"), another high-level member of the conspiracy.[2] (PSR ¶ 37; GER 127-37.)  Defendant also paid corrupt, insider bank employees for detailed information about the banks' account holders. (ER 640-41; GER 34, 60-61, 86-87, 131.)  The bank insiders even provided defendant with customer account profiles that were supposed to be used to prevent exactly the sort of fraud defendant engineered. (GER 60-62, 74-75, 86-87, 162.)

With this information, defendant had "'the keys to the kingdom,'" all the information he needed to "basically make changes to the account via telephone call, at will."  (GER 75.)

Defendant impersonated victims on calls with the banks, to update address and account information and order fraudulent checks. (ER 640; GER 29-30, 68, 162-63.)  Defendant also trained at least four of his co-conspirators to order fraudulent checks, and directed them to place orders on his behalf.  (GER 162-63.)  He paid one co-conspirator "300 bucks" whenever such an order went through, "and nine times out of ten, it did go through."  (GER 163.)

---

[2] There was evidence that defendant and Brown were working together as early as 2005.  (GER 194-212.)  Brown was incarcerated during the conspiracy, and relied on his significant other to provide defendant with victim information during his incarceration. Defendant was intercepted on a wiretap working with Brown to execute the scheme while Brown was in state prison for bank fraud.  (PSR ¶ 37; GER 127-29, 133-37.)

Several accounts throughout the conspiracy had their addresses updated to a residence on Paintbrush Lane associated with defendant. (GER 21-22, 592, 607-13, 623, 633, 638-42, 650, 659, 662-72.)  Others were updated to an address on Colima Road associated with a fake identity defendant assumed.  (GER 30-32, 601, 604, 634-35.)  Others were updated (or had checks delivered) to an address on Silver Rain Drive, where defendant lived and where his library of victim information was found (as well as two loaded firearms and hollow-point ammunition).  (GER 73-74, 115-16, 180, 614.)  Still others were updated to an address on East Arrow Highway, where defendant's ex-wife lived.  (GER 31-32, 45-46, 607-10, 637-39.)

Defendant also used the bank account information to gain access to online bank accounts, by convincing bank representatives that he wanted to start online banking or simply had lost his login information.[3]  (GER 51-52.)  With access to the online accounts, defendant could easily make whatever changes he wanted.  He could access images of legitimate checks, which served as exemplars for forgeries.  (GER 52-53, 107.)  He could move money from linked accounts (such as savings or home equity accounts) into checking accounts, so there was more money available to steal.  (GER 87-88, 133.)  He could identify recent, legitimate account activity, information defendant used to convince banks he was the true account holder.  (GER 75-76.)  All of this access and information enhanced defendant's ability to thwart traditional fraud prevention measures.

---

[3] Defendant used the same email address ("thabiggone@yahoo.com") and password ("Ferrari") for many of the online accounts he commandeered.  (GER 72-73, 81-82; see also GER 424.)  Defendant owned a number of high-value cars, including a Ferrari (as well as a Jaguar, a Lexus, a Mercedes Benz, and a monster truck).  (GER 159.)

Once the checks were ordered, defendant had to make sure he received them.  When defendant wasn't able to have the checks delivered to an address he controlled, he intercepted the checks before they were delivered.  Defendant made arrangements for a low-level conspirator to have fake driver's licenses made with the conspirators' pictures and the victims' names and addresses.  (GER 163-64.)  Sometimes, the low-level conspirators met delivery trucks outside victims' residences, showing the fake IDs to the drivers to convince them to release the packages.  (GER 164.)  If defendant could not arrange for the checks to be intercepted, he called the carrier, impersonated the account holder, and asked them to "hold the checks" for the low-level conspirator to pick up later (again using the fake IDs).  (GER 165-66.)

Once defendant had the checks, he had to make them out, and get them cashed.  (GER 53, 167.)  Defendant got copies of authentic signatures.  Sometimes, the signatures came from scans of legitimate checks from the online accounts.  (GER 53-54, 63.)  Other times, defendant pulled public records with the victims' signatures, like the "title or deed to a home."  (GER 167.)  Once he had an authentic signature, he would "[p]ractice a few times on a separate sheet of paper," until he perfected his forgeries.  (GER 69-70, 167.)

Defendant and his co-conspirators also knew that bank employees generally call to verify high-value checks before cashing them.  Defendant often changed the phone numbers associated with the victims' bank accounts to numbers he controlled.  (GER 42-43, 84.)  Then, when the bank called to verify the checks, they spoke not with the victim but with defendant or another co-conspirator, who

unsurprisingly authorized the fraudulent transactions.   (PSR ¶ 79; ER 639; GER 43-44, 84, 93-94.)

In a highly sophisticated effort to subvert banks' phone-authorization practices, the conspirators actually spoke with some victims before drawing any money from their accounts.   They called the victim account holders and figured out who their telephone service provider was, by pretending to be telemarketers offering deals on telephone services.   (PSR ¶ 79.)   Defendant and his co-conspirators then took over the telephone accounts using the same tactics they used to take over the bank accounts.   Using the array of personal information they had obtained, they impersonated the victims, told the service providers there was a problem with their phone line, and arranged to have incoming calls forwarded to a phone number they controlled until the "problem" was resolved.   (PSR ¶ 79; ER 638-39; GER 44-45.)   To ensure the service providers believed the story, the co-conspirators jammed the account holders' true phone numbers while the service providers ran initial tests to confirm there was an issue.   (GER 44-45.)

In the beginning stages of the conspiracy, defendant worked directly with "runners," who went inside the banks to cash checks.[4] But as the scheme evolved, defendant relied more frequently on "recruiters" and "supervisors" who worked underneath him.   (GER 24, 35, 55-58, 157.)   When defendant recruited others to join the

---

[4] One of defendant's co-conspirators testified that the term "bofa" (for "Bank of America," a favored target) referred to the individuals who went inside the bank, and "runners" or "supervisors" referred to the individuals who were responsible for overseeing them. (GER 163-64.)   Because the term "runner" was used more frequently during sentencing to refer to the individuals cashing the checks, and "recruiter" to refer to their supervisors, this brief adopts that phraseology.

conspiracy, he explained how the scheme worked and promised new members that "this is the way [they] can make money too." (GER 159-60.)

These recruiters "worked directly for" defendant, bringing runners into the conspiracy and supervising them. (GER 35.) Defendant managed the accounts and—once the recruiters told him who the runners would be on any given day—provided completed, forged checks. (GER 58; *see also* GER 78-79, 104-08.) One recruiter testified that he generally oversaw "[t]welve [runners] in a single day." (GER 170.) "[T]he goal was to get as many runners as possible and have 'em cash the checks in the shortest amount of time; that way, it was less likely the victim or the bank would catch on that fraud activity was occurring on the account." (GER 79.)

Ledgers found in defendant's home revealed that he kept careful records for each account. When defendant ordered checks, he made notes identifying "the date the checks would be delivered," the address to which they were being delivered, the delivery service and tracking number, the co-conspirator responsible for intercepting the checks upon delivery, the recruiter who supervised the runners, and the runners who ultimately cashed (or attempted to cash) the fraudulent checks. (*See* GER 24-27, 35-39, 54, 63-68, 82, 88-89, 96-97.)

Because defendant "was at the top with the account information," he "receive[d] approximately 50 percent of the entire cut of the money" obtained during the fraud. (GER 36-37, 171.) "[T]he other 50 percent would then be distributed" among the other co-conspirators. (GER 37.)

1    Defendant's roommate and co-conspirator testified that defendant
2    called the banks "[e]very day," got new victims' information "at
3    least twice a week," and had runners cashing checks for him "almost
4    every day."[5]  (GER 172.)  The roommate—seemingly in awe of the
5    scheme—testified that defendant told him "he invented" the scheme,
6    and "that he was the reason why everyone else" involved "was living
7    the way they did and they were able to have the lifestyle they had."
8    (GER 173.)  The co-conspirators had "some pretty expensive cars,"
9    "[e]veryone pretty much had homes," they "went out every night," had
10   "fancy clothing, jewelry," and "spent a lot of money" on their
11   partners.  (GER 173-74.)

12            2.   Conviction

13        In July 2011, in response to a defense motion for a bill of
14   particulars, the government advised defendant that it had completed
15   initial loss calculations, and determined that the loss was "well
16   over $10 million, which was taken from 325 victims"; that the
17   government believed the numbers would grow as it continued to work
18   with the victims to calculate their losses; and that the government
19   believed defendant was a leader and organizer of the fraud and was
20   "on the hook" for the entire loss amount.  (ER 734-36, 742-43 & n.2;
21   GER 373-74, 433.)

22        Consistent with that position, on December 14, 2011, the
23   government extended two plea offers that both included, among other
24   things, a 20-level adjustment for an intended loss over $7 million
25   and a six-level adjustment for 250 or more victims.  (ER 85, 87, 101,

26

27        [5] The roommate joined the conspiracy in 2007.  (GER 157.)  By
     that time, defendant's leadership role in the conspiracy was already
28   well established.  In fact, defendant bragged that he had been
     committing this kind of fraud since 1995.  (GER 173.)

211.)  Both proposed agreements computed a total offense level of 32.
(ER 101, 211.)  The first included a plea to an aggravated identity
theft charge, which carried a mandatory 24-month consecutive term.
(ER 89, 101.)  The second did not.  (ER 87, 200, 211.)  The first
offer included an agreement that a 204-month sentence (17 years) was
reasonable, and the second an agreement that 180 months (15 years)
was reasonable.  (ER 102, 212.)

Defendant rejected those offers.  On December 16, 2011,
defendant pleaded guilty without a plea agreement to one count of
conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349
(count one); one count of bank fraud, in violation of 18 U.S.C.
§ 1344 (Count 23); fourteen counts of aggravated identity theft, in
violation of 18 U.S.C. §§ 1028A(a)(1) (Counts 44, 53, 55, 58, 62, 84-
91), (2); and one count of possessing a firearm and ammunition
despite having a prior felony conviction, in violation of 18 U.S.C. §
922(g)(2) (Count 105).  (CR 521; ER 15, 632; PSR ¶¶ 2-10.)

The factual basis for the plea—which defendant testified under
oath was a "correct factual statement" of "what occurred" (ER 631,
644)—included the facts that defendant's participation began "at
least as early as in or around 2005" (ER 637) and that "in or around
[2005, approximately,] defendant fraudulently obtained checks from
victim account holders and directed a runner to cash a fraudulently
obtained check and return with the proceeds to the defendant" (ER
639, 644).  The factual basis also described the manner and means of
the conspiracy.  (ER 637-41.)

During the change-of-plea hearing, the district court explained
that the statutory maximum sentence for the bank fraud counts was 30
years' imprisonment, that the court was required to impose a two-year

9

mandatory consecutive term of imprisonment for the aggravated-identity-theft counts, and that the statutory maximum for the felon-in-possession count was 10 years' imprisonment.  (ER 633-34.) Defendant confirmed that he understood these penalties.  (ER 636.) He also confirmed that he understood "that no one, not the prosecutor, [his] counsel or the Court can make any binding prediction or promise at this time regarding [his] sentence," except that it would be within the statutory maximum.  (ER 646.)

After the court accepted defendant's pleas, his counsel indicated that there were issues concerning "amount, role, a lot of different issues" for sentencing, and that he had received a spreadsheet from the government reflecting its calculation of losses at that time.  (ER 656.)

Sentencing was initially scheduled for June 2012 (ER 656-57), but was continued multiple times, for over two years, generally at defendant's request (CR 708, 712, 833, 834, 918, 1079, 1224, 1225, 1319, 1320).

### 3. Additional Proceedings

Throughout the proceedings below, both before and after his guilty pleas, defendant exhibited a pattern of wanting to both address the court directly and have counsel represent him.  He filed letters with the district court (GER 311, 315-16, 492-93) and triggered a series of sealed, *ex parte* proceedings in which he both complimented and complained about his counsel.  (GER 426-591.) Defendant consistently represented to the Court that he was satisfied with the representation provided to him by his counsel.

10

### a.  July 28, 2011 proceedings

On July 28, 2011, the district court heard argument on a series of motions, including: motions by multiple defendants to continue the trial date (which defendant had opposed in letters he sent directly to the court); a motion to suppress wiretap evidence that included incriminating conversations in which defendant participated (which defendant joined); a motion by defendant for a bill of particulars; and a motion by defendant to suppress photographic identifications of defendant made by various runners in 2005, including Jessica Bacque. (ER 403; GER 311-13, 340, 358, 370.)

The court held an evidentiary hearing on defendant's motion to suppress the photo identifications during which Secret Service Agent Wesley Schwark, who had obtained the evidence, testified to the procedure he followed.  (GER 342-58.)  After the court denied the motion, defendant launched into what he himself recognized was a "hostile" and "emotional" tirade about the unfairness of the proceedings, particularly being charged for "the whole $10 million" of losses asserted by the government based on "fake lineup[s]."  (GER 380-82, 384.)  The court cautioned defendant that:

> So this isn't the first occasion where you felt that you're counsel of record and were going to speak, without even consulting your counsel. . . .
>
> So I want you to take a moment because you're not counsel, although you apparently are acting like an attorney—pay your counsel the courtesy of having a calm discussion with him for just a moment. . . .
>
> I just counsel you, if that [speaking out] happens during trial in front of a jury, it's gonna make a very bad impression.

1   (GER 382–84.)  Defendant asserted that "it will never happen again."

2   (GER 384.)

3        Immediately after the hearing, at defendant's request, the court

4   met privately with him and his counsel.  Defendant again complained

5   that the photo lineups were flawed and that the government was

6   improperly using them to hold him accountable for "the whole $10

7   million" in losses dating back to 2005.  (GER 433–34.)  He complained

8   that he did not have "effective counsel in a motion that's like the

9   most important motion in the world." (GER 439.)  However, after the

10  court again noted how defendant had been attempting to act as his own

11  attorney, advised defendant that he had a right to represent himself

12  under *Faretta v. California*, 422 U.S. 806 (1975), and cautioned him

13  that he needed to get his outbursts under control (GER 440, 442–44,

14  449), defendant stated, "I really, really, really like Mr. Wolfsen.

15  Okay.  I really think he's a good attorney. . . . I don't want to

16  relieve Mr. Wolfsen." (GER 450.)  Defendant acknowledged that his

17  "emotions were out of control" and that he was "upset at [his]

18  attorney" (GER 453), but presented again with the choice of having

19  Wolfsen as his counsel or not, affirmed that he did want Wolfsen to

20  represent him.  (GER 461–62, 485.)

21            b.  *December 26, 2012 sealed proceeding*

22       Ten days after defendant entered his guilty pleas, and after

23  defendant had sent more *ex parte* communications to the court, the

24  court again met with defendant and his counsel.  Defendant again

25  complained about the photo identifications and the prospect of a long

26  prison sentence based on a high loss amount.  (GER 494–98, 502.)

27  Counsel explained that he and defendant had a disagreement because

28  defendant wanted him to file a motion to withdraw defendant's guilty

pleas on the (erroneous) theory that proving the photo identifications were flawed would invalidate the grand jury indictment. (GER 508, 517, 522-24.) Counsel noted that the losses associated with the runners who made challenged photo identifications was "about $87,000," out of "a loss amount of $7 million." (GER 518, 520.) Despite the disagreement, defendant stated, "I do not want him [Wolfsen] relieved ever." (GER 515.)

The court indicated that defendant appeared to be disputing whether he could be held accountable for losses based on the allegedly bad photo identifications and that this issue could be addressed at sentencing. (GER 509-10, 518-20, 526.)

### c. July 30, 2013 sealed proceeding

On July 30, 2013, the court held another sealed, *ex parte* proceeding at defendant's request, at which defendant again complained about the photo lineups and expressed his desire not to be held to account for the full scope of losses for the conspiracy. (GER 537-40.) When the court, apparently referring back to the July 28, 2011 evidentiary hearing, stated that "at one time, you wanted to represent yourself," defendant stated, "Never . . . I said I'd never do that." (GER 541.)

### d. June 13, 2014 sealed proceeding

In another *in camera* hearing about two weeks before the sentencing evidentiary hearing on loss, defendant complained yet again about the loss-amount dispute. Defendant asserted for the first time that he, his counsel, and their investigator had reviewed the discovery and computed a maximum loss of $4.5 to $4.7 million "for the entire conspiracy." (GER 547-48, 555-56.) His counsel acknowledged that the government had provided a spreadsheet showing

13

the losses it claimed, but asserted that "the spreadsheet has no supporting documentation." (GER 556.) The court questioned why a dispute over loss amount was being raised *ex parte*. When defense counsel suggested that it was because defendant had raised an issue of ineffective assistance, the court asked if defendant was attempting to remove Wolfsen as his counsel. (GER 558.) Defendant equivocated, saying "I think it is more the fault of the prosecutor because he interfered with our ability for him to advise me." (GER 558.)

When the court persisted in its inquiry into the basis for holding the hearing in the absence of government counsel (GER 557-58, 561, 574, 577), defendant was all over the board, first saying he wasn't "pulling my plea and saying I'm not guilty" (GER 567); then "I may be seeking to withdraw my plea (GER 578); moments later, "I'm seeking to withdraw my plea" but "not Mr. Wolfsen" (GER 579); and finally, after conferring counsel, stating that he did not want to withdraw his plea (GER 581).

4. Sentencing Proceedings

a. The PSR and the parties' positions

The Probation Office computed a Sentencing Guidelines range of 324 to 405 months' imprisonment, plus the 24-month mandatory consecutive term for aggravated identity theft, based on a total offense level of 36 and a criminal history category of VI. (PSR ¶¶ 106, 168, 216.) The total offense level consisted of base offense level of seven, a 20-level increase for loss over $7 million, a six-level increase for 250 or more victims, a two-level increase for sophisticated means, a four-level organizer-leader role enhancement, and a three-level reduction for acceptance of responsibility. (PSR

14

¶¶ 73-80, 87, 105.) The 20-level loss adjustment was based on actual losses of $8 million sustained by just one victim bank, Bank of America, and an additional $5.7 million the conspirators unsuccessfully attempted to obtain from Bank of America. (PSR ¶¶ 66, 73, 75.[6])

Defendant's criminal history showed a long series of convictions throughout defendant's adult life. (PSR ¶¶ 114-82.) He had a total of 26 criminal history points (twice the threshold for category VI) and pending charges in two states. (PSR ¶¶ 168, 181-82.) He had numerous convictions for offenses involving identity theft, credit card or access device fraud, and false impersonation, dating back to 1995. (PSR ¶¶ 121, 136, 139, 149, 152, 155-57, 159.) A probation search in 2002 uncovered numerous materials used for identity theft and check making. (PSR ¶ 157.)

The government agreed with the calculations of the PSR but argued that the court should apply an additional two-level vulnerable victim adjustment based on evidence that the co-conspirators targeted the elderly. (ER 614, 620-21.)

Defendant objected to the entire statement of offense conduct in the PSR, including statements that were in the factual basis of his pleas. (ER 531-32.) He stated that he "challenge[d] the criminal history," but did not identify any inaccuracies in it. (ER 531.) The focus of defendant's objections, however, related to loss, and

---

[6] The felon-in-possession conviction did not add anything to the Guidelines calculation because it was so far below the fraud offense level. (PSR ¶¶ 93, 98, 100, 104.)

15

the extent to which defendant could be held to account for the
conduct of his co-conspirators.[7]  (ER 532-47, 553, 567, 582-93.)

> b.   *Evidence regarding loss amount*

The court conducted an extensive evidentiary hearing over the
course of four days that included testimony from three government
witnesses and eight defense witnesses.[8]

With respect to loss, the government introduced two
spreadsheets, prepared by Secret Service Special Agent James
Mikkelson, setting forth a victim-by-victim analysis of what Agent
Mikkelson labeled as the "known loss" and "intended loss" for each
victim account.  (GER 16-17, 592-657.)  "Known loss" was the value of
the checks the co-conspirators cashed out.  (GER 16-17.)  "Intended
loss," as Agent Mikkelson defined it, included (a) checks presented
for payment and not honored and (b) any additional amounts the co-
conspirators shifted from high-balance accounts into linked checking
accounts they controlled.  (GER 17-18.)  So, for example, if

---

[7] It bears repeating that defendant bragged as early as 2007
that he had "invented" the scheme, taught his co-conspirators how to
carry it out, and was "the reason why" his co-conspirators were able
to live a luxurious lifestyle.  (GER 173.)  Many of defendant's
complaints related to the fact that he went to prison and the
conspiracy still hummed along in his absence.  (*See* ER 567-68, 570.)
As to that, there was evidence that members of the conspiracy
continued to participate in it despite their incarceration.  (*See* PSR
¶ 37; GER 126-29, 133-37.)  More fundamentally, given defendant's
role as a mentor and teacher for new co-conspirators, it surely was
foreseeable that they would continue using the skills they learned
from defendant even when he wasn't around to supervise them.

[8] The defense witnesses related to defendant's prior cooperation
efforts, years before his indictment in this case, and his character.
Defendant also testified on his own behalf, repeatedly minimizing his
role in the scheme and even backing away from some of what he had
admitted in the factual basis when he pleaded guilty.  (*See* ER 405-
25.  *Compare* ER 640 (factual basis, noting that defendant recruited a
certain corrupt bank insider to the conspiracy), *with* GER 415
(defendant denying same).)

defendant transferred $20,000 from a victim's savings account to a checking account defendant had taken over, but runners only successfully cashed $10,000 worth of checks, the cashed funds were counted as "known loss" and the remaining $10,000 was listed as an "intended loss." (GER 17.) Thus, the column Agent Mikkelson labeled as "intended loss" is more accurately characterized as "unrealized loss," and the true intended loss, as used in the Guidelines, is the sum of the two calculations, which Agent Mikkelson displayed in a column labeled "Total Intended + Known."[9] (GER 17-18, 592-657.)

The spreadsheets also identified the individual co-conspirators who were tied directly to the fraud perpetrated on each account in a column labeled "defendants," and the basis for the linkage in a "notes" column. (GER 592-657.) One spreadsheet displayed just the victims tied directly to defendant. (GER 633-57.)

Defendant was tied to specific accounts in a variety of ways—identification by the runners who cashed the checks from that account, documentation found in searches, use of addresses or phone numbers associated with defendant, conversations in recorded and intercepted phone calls, etc. (GER 19-20, 29-31, 148.)

Specifically with respect to 2005, defendant was tied to some transactions by Bacque and other runners whose photo identifications defendant disputed. (GER 592, 633.) However, he was tied to other 2005 transactions by independent means, including the use of his Paintbrush Lane address. (GER 592, 633.) For example, the spreadsheets identified defendant as having victimized a company

---

[9] *United States v. Carboni*, 204 F.3d 39, 47 (2d Cir. 2000) ("Logically, intended loss must include both the amount the victim actually lost and any additional amount that the perpetrator intended the victim to lose.").

called Pro Italia Motors in 2005 (GER 592, 633) based on underlying documentation showing that defendant (1) obtained account information for the Pro Italia Motors account in November 2005; (2) took over the account in December 2005, changing the address on the account to his Paintbrush Lane address and updating the telephone number; and (3) then ordered new checks, nine of which were cashed on December 27, 2005.  (GER 658-72.)

The analysis in the spreadsheets was supported by 19 binders of source documents that included copies of the fraudulent checks, photo identification cards reflecting runners' identifications of defendant and his co-conspirators, items recovered from defendant's residence tying him to victim accounts, and other evidence underlying and supporting Agent Mikkelson's analysis.  (GER 12-13, 15.)

For example, the fraud perpetrated on the joint account of victims M.F. and A.F was linked to defendant (GER 601, 634) by documents found during the search of his residence, which included: (1) a copy of a check belonging to M.F. and A.F., which had their account and routing information, their true address, and A.F.'s signature (GER 24, 673); and (2) a list with the names of three runners—Victorio Atencio, Aljurito Wilson, and "Towner"—who were payees on fraudulent checks cashed from the M.F./A.F. account (GER 24-28, 673-77).

As a further example, joint account victims S.V. and C.L. were connected to defendant (GER 601, 634) by a recorded call in which defendant phoned the bank, impersonated an account holder, and changed the account address to his Colima Road address.  (GER 30.) He also updated the phone number to a "burner" phone he used to communicate with his co-conspirators.  (GER 33-34.)

The total actual loss for the entire conspiracy was $8,204,114.98, and the unrealized loss was $12,039,413.64, for a total intended loss under the Guidelines of over $20 million. (GER 97; GER 632.) Defendant was personally and directly tied to an actual loss of $4,011,564.08, an unrealized loss of $6,182,056.49, and a total intended loss of over $10 million. (GER 657.)

        *c.   Testimony regarding the photo lineups and defendant's request for self-representation*

During the sentencing hearing, the government called Agent Schwark to testify to the photo lineups, as he had at the July 28, 2011 evidentiary hearing, and the testimony prompted an outburst by defendant, similar to his July 2011 outburst. (GER 236, 252, 256-59.) Late on a Friday afternoon, just as the government was concluding its re-direct of Agent Schwark and trying to introduce evidence related to defendant's involvement in fraudulent check-making in 2002, defendant abruptly interjected that he would "like to represent" himself because "it's not fair to me not to be able to speak for myself." (ER 444; GER 256.) Defendant simultaneously stated that he also wanted his attorney as advisory counsel. (ER 444; GER 256.) Defendant continued on with an emotional statement in which he claimed that "it's bigger than loss amount" and that Schwark "framed" him. (ER 444-45; GER 256-57.)

The court tried to calm defendant, stating "I want to stop you for just a moment. We've got plenty of time." (ER 445; GER 257.) The court pointed out that defendant had not served his own interests well when he had spoken out in the past, that he had been "very aggressive" about speaking out, constantly interrupted the court, made statements to the effect that he didn't know anything about the

19

1    fraud after pleading guilty, and attempted to "turn this sentencing

2    proceeding basically into a trial." (ER 445-47; GER 257-59.)

3    Recognizing that defendant's emotions appeared to be getting the

4    better of him again, the court proposed that to "protect" defendant,

5    it recess the proceedings and "take a breather until Monday." (ER

6    447; GER 259.)

7         Defendant's counsel, however, noted that Bacque,[10] a defense

8    witnesses, had been waiting to testify for two days, that coming to

9    court was a particular burden for her, and requested that she be

10   accommodated. (ER 447; GER 259.) Defendant did not object, and the

11   court accommodated the request. (ER 447; GER 259.)

12        Since Agent Schwark had flown in from Washington, D.C., the

13   court also allowed him to complete his testimony, with no objection

14   by defendant or his counsel. (ER 447-48; GER 259-60.) That

15   completion consisted of two questions on re-cross examination. (ER

16   448; GER 260.)

17        After that, Bacque was called and testified briefly that she did

18   not recall identifying defendant in a photo lineup and did not

19   recognize the writing on Agent Schwark's photo identification card as

20   her own. (ER 451-52; GER 263-64.) Defense counsel then started to

21   ask Bacque about her involvement in the conspiracy. (ER 453; GER

22   265.) The court, recognizing the potential for self-incrimination,

23   confirmed that Bacque had never been prosecuted federally, advised

24   her of her Fifth Amendment rights, and arranged for her to speak with

25   appointed counsel. (ER 453-65; GER 265-77.) After consulting with

26

27   _____

28        [10] Since identifying defendant in 2005, Bacque had changed her
     last name to Samra. (ER 450; GER 262.)

                                    20

counsel, Bacque invoked her Fifth Amendment privilege and testified that she would not answer any questions.  (ER 465-66; GER 277-78.)

After she left, defendant again said that he wanted to represent himself and launched into another, even more emotional monologue, about "fabricated" lineups and how Bacque "got scared" out of testifying when she was advised of her rights.  (ER 468-72; GER 280-84.)  He lamented that "it's over.  What do I have?  I don't have nothing."  (ER 469; GER 281.)

The court noted defendant's highly "emotional state."  (ER 475; GER 287.)  The court said it was willing to consider defendant's "renewed motion" to represent himself, but noted that it did not believe the case law supported such a motion "in the middle of a proceeding like this."  (ER 475; GER 287.)  The court stated that it would conduct the *Faretta* colloquy after the weekend recess.  (ER 479-82; GER 291-94.)

### d.    The *Faretta* *hearing*

After the weekend recess, the court conducted a *Faretta* inquiry. The court first explained that it had been allowing a "hybrid situation" in which defendant as well as his counsel would speak; that whenever they had had any disagreements, in the end defendant "always made the decision eventually" to have his counsel represent him; and that, against this backdrop, the court had evaluated defendant's outburst the Friday before as one more instance in which defendant "got frustrated with the presentation" and wanted to be heard directly and "get the best of both worlds."  (ER 324, 329.)

With the benefit of the weekend cooling-off period, the court said it would allow defendant to represent himself if he still wanted to.  (ER 325.)  Defendant elected to do so after a *Faretta* colloquy,

21

but specifically requested that Wolfsen remain on board as standby counsel.  (ER 326; *see also* ER 333-52.)

### e.   *Unavailability of defense investigator Spada*

After another defense witness testified briefly, defendant stated that he had an additional witness, whom he had not subpoenaed, who was unavailable until Friday.  (ER 353.)  The witness, Tracy Spada, was an investigator who had interviewed Bacque about the photo lineup.  (ER 354-55.)  The court noted that Spada's testimony regarding what Bacque told her would be hearsay.  (ER 355-56.)  The government indicated that since the court could consider hearsay at sentencing (which the court acknowledged as well), the government was amenable to considering admission of Spada's interview report, but apparently the only copy had been handed to Bacque on Friday and not returned.  (ER 358-59.)

Defendant acknowledged that what he was trying to show the court was that he had been "set up by the police."  (ER 361.)  The court explained that it was not prepared to accept that "ultimate issue" without Bacque testifying.  (ER 361-62.)  Defendant agreed that the court needed Bacque's testimony as to that, and asked the court to order the government to give her immunity.  (ER 361-62.)  The court declined, and defendant dropped the matter.  (ER 361-62.)  He did not ask to call any additional witnesses, and did not ask for any further continuance.  (ER 361-62.)

### f.   *Motion to withdraw guilty plea*

After a recess, the court took up a request defendant had made for the first time during the evidentiary hearing the previous Friday to withdraw his guilty pleas.  (ER 367-68.)  Defendant affirmed that he was seeking to withdraw his pleas on the grounds that he had not

been fairly informed about the scope of the losses and victim count. (ER 368-73.)  Defendant complained that the discovery he received showed only $4.5 million in losses and 186 victim accounts, and he alleged that his counsel told him he didn't have to worry about more than that.  (ER 371.)  He also complained that the government had interfered with his relationship with his attorney by requesting that Wolfsen not provide defendant with a copy of its loss spreadsheet. (ER 370-71.)

The government objected to the motion, noting that the Rule 11 colloquy specifically advised defendant that nobody could make any binding prediction about the likely sentence, and that defendant's complaints now amounted to nothing more than a complaint that he had different expectations than how it seemed things were going to turn out.  (ER 373-74; *see also* ER 646.)

As a remedy, defendant wanted the plea agreement that contained the stipulation to the reasonableness of a 15-year sentence and claimed that he would have accepted that agreement had he not been "misled."  (ER 372 ("I want my plea agreement back.  I was misled."); ER 375 ("I need that plea agreement back . . . ."); ER 376 (" . . . I would have taken [the plea agreement] if I would have known that this was the way [the government] was going to approach [sentencing].").) In making this claim, defendant ignored the fact that the plea agreement required him to stipulate that the loss was over $7 million and that a 20-level enhancement for loss was appropriate (ER 211), which he adamantly refused to do.  Government counsel was also mistaken at the time, stating incorrectly that the government had not previously extended a formal plea offer to defendant.  (ER 378.)

The court denied defendant's motion, finding that there had been no improper interference with the attorney-client relationship, no discovery violations, no ineffective assistance of counsel, and no unfair or improper plea negotiations.  (ER 379.)  To the contrary, the court stated, it was convinced that defendant's plea was free and voluntary.  (ER 379.)  "There was an extensive factual basis.  There was every modicum of due process . . . by this court and all counsel involved, and a tremendous amount of caution by everyone."  (ER 379.)

### g.   Sentence

At defendant's request, the court applied a clear-and-convincing standard for its factual findings at sentencing.  (ER 381.)

The court found clear and convincing evidence that defendant was responsible for over $10 million of intended losses based on his "personal participation" in the conspiracy, and a minimum of $9 million for his "participation solely without the relevant conduct" of others.  (ER 24-25.)  The court found defendant personally responsible for at least $4 million in actual losses, and conservatively at least another $5 million in unrealized losses.  (ER 24-25.)

The court also found by clear and convincing evidence that the conduct of defendant's co-conspirators was reasonably foreseeable to him and in furtherance of the jointly undertaken criminal activity, and that the resulting intended loss was about $13 million—$8 million in actual losses and $5 million in attempted losses.  (ER 25.)  Based on the 19 volumes of supporting documentation submitted by the government, the court was "extraordinarily confident" that these losses, which excluded all of the losses that involved Bacque, had been established.  (ER 405, 410-11; see also ER 417-21, 437.)

Indeed, the court found that $20 million in intended losses was "easily shown," but opted to use lower figures to avoid increasing defendant's offense level further. (ER 25, 408-09, 411.) In order to keep defendant's Guidelines calculation as low as possible, the court also reduced the 277 victims to less than 250 (thereby reducing the victim adjustment from six levels to four), and did not apply a two-level adjustment for targeting vulnerable victims. (ER 26-27, 398-99, 422.)

The court computed a total offense level of 34, two levels higher than the unaccepted plea agreement. (ER 28, 211.) At criminal history category VI, this resulted in a Guidelines range of 262 to 327 months' imprisonment. (ER 28.) The court sentenced defendant to a mid-range sentence of 300 months' imprisonment. (ER 16, 35.)

## III. LEGAL FRAMEWORK

A § 2255 claim provides for a challenge to a conviction or sentence on the ground that the judgment of the district court violated the Constitution or the laws of the United States. See 28 U.S.C. § 2255. A court may deny a § 2255 motion founded on "bald legal conclusions with no supporting factual allegations." Sanders v. United States, 373 U.S. 1, 19 (1963); see also Wacht v. Cardwell, 604 F.2d 1245, 1247 (9th Cir. 1979) (bald assertions and conclusory allegations are insufficient to support collateral challenge to conviction and/or to afford sufficient grounds for an evidentiary hearing).

Pro se habeas claims are construed liberally. See, e.g., Porter v. Ollison, 620 F.3d 952, 958 (9th Cir. 2010). But even in the pro se context, federal courts are not required "to construct legal

25

arguments" for habeas petitioners.  Brian R. Means, <u>Postconviction</u>
<u>Remedies</u> § 12.6 (July 2012); <u>see also</u> <u>Sanders v. United States</u>, 373
U.S. 1, 19 (1963) (court may deny Section 2255 motion founded on
"bald legal conclusions with no supporting factual allegations");
<u>Ledbetter v. City of Topeka</u>, 318 F.3d 1183, 1188 (10th Cir. 2003)
(even in the <u>pro se</u> context, courts will not "assume the role of
advocate"); <u>Wacht v. Cardwell</u>, 604 F.2d 1245, 1247 (9th Cir. 1979)
(bald assertions and conclusory allegations are insufficient to
support collateral challenge to conviction and/or to afford
sufficient grounds for an evidentiary hearing).

Under governing Supreme Court law, defendant's failure to raise
an issue on direct appeal alone constitutes a procedural default.
<u>Bousley v. United States</u>, 523 U.S. 614, 622 (1998).  In <u>Bousley</u>, the
Court held:

> Where a defendant has procedurally defaulted a claim by
> failing to raise it on direct appeal, the claim may be
> raised in habeas only if the defendant can first
> demonstrate . . . "cause" and actual "prejudice" . . .

<u>Id.</u> at 622.  Nearly every other Circuit has adhered to Bousley's
rule.  <u>See, e.g.,</u> <u>United States v. Awon</u>, 308 F.3d 133, 142-43 (1st
Cir. 2002) (default before court of appeal alone); <u>United States v.</u>
<u>Canady</u>, 126 F.3d 352, 359 (2d Cir. 1997) (same); <u>United States v.</u>
<u>Sanders</u>, 165 F.3d 248, 250 (3d Cir. 1999) (same); <u>United States v.</u>
<u>Willis</u>, 273 F.3d 592, 596 (5th Cir. 2001) (same); <u>Elzy v. United</u>
<u>States</u>, 205 F.3d 882, 884 (6th Cir. 2000) (noting "double default"
for failure to raise objection at trial and on appeal); <u>Galbraith v.</u>
<u>United States</u>, 313 F.3d 1001, 1007 (7th Cir. 2002) (same); <u>Swedzinski</u>
<u>v. United States</u>, 160 F.3d 498, 500 (8th Cir. 1998) (same); <u>United</u>

26

1   States v. McDonald, 150 F.3d 1301, 1303 (10th Cir. 1998) (same);

2   Jones v. United States, 153 F.3d 1305, 1307 (11th Cir. 1998) (same).

3   The Ninth Circuit, however, has yet to explicitly recognize that

4   Bousley overrules one of its outlier cases, United States v. English,

5   42 F.3d 473 (9th Cir. 1994).  In English, a split panel of the court

6   departed from a decision handed down the year before in Johnson, 988

7   F.2d at 945, which had faithfully followed Frady's rule.  The English

8   majority, however, held that a defendant who complies with a

9   contemporary objection rule before the district court does not

10  procedurally default his claim, even when he fails to raise it on

11  direct appeal.  42 F.3d at 480.

12      English directly conflicts with Bousley, and accordingly has

13  been effectively overruled.  Although the issue has been presented to

14  the Ninth Circuit, that court has yet to confront the issue.  See,

15  e.g., United States v. Guess, 203 F.3d 1143, 1145-46 (9th Cir. 2000)

16  (not reaching issue because government did not argue procedural

17  default in the district court); United States v. Kaczynski, 239 F.3d

18  1108, 1113-14 (9th Cir. 2001) (not reaching issue because adequate

19  "cause" existed to excuse any procedural default), cert. denied,

20  535 U.S. 933 (2002); United States v. Ware, C.A. No. 03-15609 (9th

21  Cir. Aug. 4, 2005) (noting that defendant's failure to raise

22  sufficiency challenge before the Ninth Circuit could amount to a

23  procedural default, but government did not assert that defense in

24  § 2255 litigation).  Under Bousley, therefore, a claim not raised on

25  direct appeal is procedurally defaulted.

26      Where an issue is not raised on direct appeal, this court may

27  entertain those claims in this § 2255 proceeding only if a defendant

28  establishes both cause for failing to raise the issue and resulting

27

prejudice.[11]   Frady, 456 U.S. at 162, 164; Benboe, 157 F.3d at 1183;

United States v. Ratigan, 351 F.3d 957, 964 (9th Cir. 2003).  The

elements constituting "cause" have been narrowly construed by the

Supreme Court.

First, a defendant may demonstrate that the legal or factual

argument was "so novel" that it was utterly unavailable previously.

See Reed v. Ross, 468 U.S. 1, 16 (1984).  It is not enough, however,

to show that making the argument would have been futile in light of

existing caselaw.  See Bousley, 523 U.S. at 623; Engle v. Isaac, 456

U.S. 107, 130 n.35 (1982).  Moreover, claims that are sufficiently

novel to excuse a procedural default are likely to be "new rules"

that are not retroactively applicable to cases on collateral review

under Teague v. Lane, 489 U.S. 288 (1989).

Second, a defendant may attempt to demonstrate that his counsel

was constitutionally ineffective within the meaning of Strickland v.

Washington, 466 U.S. 668, (1984).  A defendant claiming ineffective

assistance of counsel must make a two-fold showing: (1) that

counsel's actions were outside the wide range of professional

competent assistance and (2) that the defendant was prejudiced by

counsel's actions.  United States v. Oplinger, 150 F.3d 1061, 1071-72

(9th Cir. 1998) (quoting Strickland v. Washington, 466 U.S. 668, 687-

90 (1984)).  An ineffective-assistance-of-counsel claim will fail

unless both prongs are established; indeed, in assessing such a

claim, courts need not address both prongs if the defendant makes an

---

[11] A district court may also excuse a procedural default where
the defendant makes a colorable showing of actual, factual innocence.
See United States v. Benboe, 157 F.3d 1181, 1183 (9th Cir. 1998);
Schlup v. Delo, 513 U.S. 298, 327-28 (1995).  Defendant does not make
any credible claim of actual innocence here.

28

1    insufficient showing on either one.  Strickland, 466 U.S. at 697;

2    United States v. Olson, 925 F.2d 1170, 1173 (9th Cir. 1991).  "If it

3    is easier to dispose of an ineffectiveness claim on the ground of

4    lack of sufficient prejudice . . . that course should be followed."

5    Strickland, 466 U.S. at 697.

6         Under the error prong of this test, "the court should recognize

7    that counsel is strongly presumed to have rendered adequate

8    assistance and made all significant decisions in the exercise of

9    reasonable professional judgment."  Strickland, 466 U.S. at 690.  "A

10   court must indulge a strong presumption that counsel's conduct falls

11   within a wide range of reasonable assistance; that is, the defendant

12   must overcome the presumption that, under the circumstances the

13   challenged action might be considered sound trial strategy."  United

14   States v. Bosch, 914 F.2d 1239, 1244 (9th Cir. 1991).  That

15   presumption arises from the fact that there "are countless ways to

16   provide effective assistance in any given case."  Strickland, 466

17   U.S. at 689.  Indeed, to satisfy the deficient-performance prong, the

18   error must be "so serious that counsel was not functioning as the

19   'counsel' guaranteed the defendant by the Sixth Amendment."

20   Strickland, 466 U.S. at 687-88.  "Tactical decisions that are not

21   objectively unreasonable do not constitute ineffective assistance of

22   counsel."  Hensley v. Crist, 67 F.3d 181, 185 (9th Cir. 1995).

23        In addition, a defendant must demonstrate prejudice from any

24   alleged error.  To establish prejudice satisfying Strickland's second

25   prong, a "defendant must show that there is a reasonable probability

26   that, but for counsel's unprofessional errors, the result of the

27   proceeding would have been different.  A reasonable probability is a

28

                                    29

1   probability sufficient to undermine confidence in the outcome."

2   Strickland, 466 U.S. at 694.   There is no prejudice if the absence of

3   the alleged error would not have created any benefit, such as if

4   the motion a defendant alleges was not brought would have failed.

5   Baumann v. United States, 692 F.2d 565, 572 (9th Cir. 1982) (no

6   prejudice from failure to move for dismissal of counts of the

7   indictment because counts were not defective).

8   **IV.   THE MOTION MUST BE DENIED**

9         **A.    There Was No Ineffectiveness Assistance of Counsel with**

10             **Respect to Counsel's Handling of the Bacque Identification**

11        Defendant spends much of his motion attacking counsel's handling

12   of six-pack identification that Agent Schwark obtained from Jessica

13   Bacque.  (Mot. at 1-18.)  Defendant suggests that his counsel failed

14   to adequately discredit the Bacque identification and should have

15   procured immunity so that Bacque could testify.  He also suggests

16   that counsel's deficient conduct impacted the voluntariness of his

17   plea.  There was no defective representation because counsel

18   adequately cross-examined Schwark and elicited testimony from Bacque

19   that she did not make the identification.  In any event, defendant

20   cannot establish any prejudice.  Defendant did not plead guilty to a

21   count charged based on the Bacque identification and the Court

22   excluded loss amounts linked to Bacque at sentencing.

23        Defendant's attorney cross-examined Agent Schwark at length

24   regarding the supposedly suggestive lineups, and those questions

25   covered all of the disputed identifications, including Bacque's.

26   (GER 212-29, 347-58.)  Defendant does not identify any questions he

27   would have asked Bacque, and even if he did there is no reason to

28   believe she would have answered any questions rather than asserting

                                    30

the privilege.  Indeed, defendant indicated below that he concurred with his counsel's assessment that Bacque would refuse to testify further without immunity.  (ER 354-55, 361-62; *see also* ER 466.) Additional questions would have served no purpose other than unnecessarily prolonging the proceedings.  Moreover, Bacque invoked her right against self-incrimination only *after* testifying that the writing on the challenged identification card was not hers.  (ER 451-52.)  Thus, the district court had before it exactly the evidence defendant had hoped to elicit from Bacque and defendant fails to identify any information that he could have obtained from Bacque if Bacque were immunized.

The fact that Bacque left with the only copy of the defense investigator's memorandum of interview is a fortuity unconnected with effective assistance of counsel.  Bacque could just as easily have left with that memo had defendant been representing himself or had defendant been represented by another lawyer.  Moreover, the point made in the interview memorandum had already been made through Bacque's pre-invocation testimony.  (ER 451-52.)  Beyond that, as the court explained and as defendant agreed, introduction of the memorandum would not have affected the court's assessment.  (ER 355-61.)

The entire issue of the Bacque identification is a moot point because defendant did not plead guilty to a count that was predicated on the Bacque identification.  To the contrary, at the time of his guilty plea, he disputed Bacque's and others' identifications and therefore declined to enter into a guilty plea on counts based on those identifications.  <u>See</u> Supra 10-13.  Defendant's plea was voluntary as he was well aware of the purported Bacque issues when he

pleaded guilty.  At most, the Bacque identification issues could have been relevant at sentencing because they constituted relevant conduct under the Sentencing Guidelines but the district court excluded all losses that were linked to defendant based on Bacque's identification.  (ER 405, 410.)  Indeed, even if all transactions in 2005 are excluded,[12] even those linked independently of Bacque, the reductions would not affect the Guidelines calculations: actual loss would fall by just $304,302.16, and intended loss by just $351,502.16.[13]  (GER 592 (sum of victims J.V./T.V. through Pro Italia Motors).)  This is much less than the more than $1 million drop in actual losses, and $6 million drop in intended losses, necessary to bring the conspiracy's losses foreseeable to defendant below the $7 million threshold.  U.S.S.G. § 2B1.1(b)(1) & Application Note 3(A). (ER 25 (finding conspiracy's actual losses to be $8 million and intended losses to be $13 million).)

The same is true for the impact on the intended losses for which defendant was personally responsible, without regard for relevant conduct—defendant was directly and personally linked to just $288,202.16 in intended losses in 2005 (GER 633 (sum of victims J.V./T.V. through Pro Italia Motors)),[14] far less than the $2 million

---

[12] The fact that defendant is even contesting whether he was a member of the conspiracy starting in 2005 is anomalous, given that he admitted that as part of the factual basis for his plea.  (ER 637, 644.)  He even admitted to having a runner cash a check on his behalf in 2005.  (ER 639, 644.)

[13] These figures include the Bacque-related transactions that the court already discounted.

The change in the number of victims is similarly inconsequential.  Excluding all 2005 activity, only 12 victims would even arguably fall out.  (GER 592.)  Defendant would still be well within the 50 to 250 victim range.  U.S.S.G. § 2B1.1(b)(2).  (ER 422 (finding defendant responsible for, at a minimum, 177 victims).)

[14] Again, including the already-discounted Bacque losses.

32

drop necessary to bring defendant's personal responsibility below the $7 million loss threshold. (ER 24-25 (finding defendant personally responsible for at least $9 million in intended losses without regard for relevant conduct).)

In fact, defendant himself admitted that he was involved in the conspiracy "really heavy" by 2008. (GER 423; *see also* GER 157 (co-conspirator testifying to defendant's leadership role from at least 2007 onward).) If *every* loss related in any way to an overt act before 2008 is excluded, the intended losses tied directly to defendant would drop by only $615,713.94 (GER 633 (sum of victims J.V./T.V. through J.M./R.M.)), again much less than the $2 million drop necessary to bring defendant's personal intended loss amount below the $7 million threshold.

Given the incredible losses caused by the conspiracy and directly tied to defendant, his complaints—even giving defendant the benefit of every doubt—simply do not impact the loss amount enough to make any difference in the offense level calculations.[15]

Finally, defendant suggestion that further investigation of the six-packs would have revealed a government conspiracy to frame him is entirely contradicted by the evidence. Putting the six-pack identifications aside, the evidence of defendant's guilt was overwhelming and included evidence of almost every type and kind: wiretap statements, recorded bank statements where he was impersonating patients, cooperating co-conspirators who testified against him, fake identifications bearing his photo that he procured

---

[15] The same calculations illustrate the harmlessness of any error in denying defendant's request for a continuance, and any error in not fully defining the scope of defendant's participation in the conspiracy between 2005 and 2008.

1   through fraud at California DMV, and more than a hundred documents at

2   defendant's home that linked him to the fraud.  Defendant admitted

3   his guilt to the court under oath at his change of plea hearing and

4   at sentencing.  In short, the evidence of defendant's guilt was

5   overwhelming and the six-pack identifications were not material to

6   his conviction or sentence.[16]

7       **B.   There Was No Ineffectiveness Assistance of Counsel with**
        **Respect to Any Advice Provided Regarding 18 U.S.C. § 1029**
8       **Or a Sentencing Enhancement for Access Device Fraud**

9       Defendant claims that his attorney provided ineffective

10  assistance of counsel by telling him that if he did not plead guilty

11  the government would file additional charges for access device fraud

12  and would seek an enhancement at sentencing for use of an access

13  device.  (Mot. at 17-18.)  In other words, if he pleaded guilty the

14  government would agree not to pursue those charges or enhancements.

15  According to defendant, defendant's conduct did not subject him to

16  liability under 18 U.S.C. § 1029 or an enhancement under the

17  Sentencing Guidelines because a check is not an access device.  This

18  claim is meritless too.  Even assuming arguendo that his counsel

19  misadvised him of the applicability of 18 U.S.C. § 1029 or an

20

21  ─────────────────────────

22      [16] Defendant is a career fraudster and it is unsurprising that he
    has chosen to submit false declarations to the Court from his ex-
23  girlfriend and his mother claiming that the six-packs were forged
    because he did not own the clothing worn in the photo at the time of
24  the identifications.  Defendant had ample opportunity to call these
    witnesses when he contested the identifications pre-trial and at
25  sentencing.  Neither of the declarants is credible.  The record at
    sentencing established that Cox's ex-girlfriend was a participant in
26  the fraud scheme.  As Cox's exhibits demonstrate, his mother was
    involved in assisting in his defense in challenging the
27  identifications and never came forward with this claim.  The Court,
    however, does not need to rule of the credibility of these witnesses
28  because the identifications were not the basis of his guilty plea and
    the court did not rely on the identifications at sentencing.

enhancement under the Sentencing Guidelines, he cannot establish prejudice.[17]  When he pleaded guilty, he did so after rejecting plea agreements with the government instead opting to plead "straight up" without any agreement.  <u>See</u> Supra at 8-10.  Because there was no agreement with the government, the government was free even after his plea to file additional charges for 18 U.S.C. § 1029 or any other criminal offense.  In other words, defendant could not have been induced to plead guilty based on a promise not to further prosecute that did not exist.  Defendant understood when he pleaded guilty that there were no promises or expectations with respect to the sentence that he would receive except that it would be within the statutory maximum.  <u>See</u> Supra at 8.  Therefore, defendant could not have been induced to plead guilty based on the applicability of sentencing enhancements.  Finally, there is no prejudice in any event as the Court declined the government's recommendation to impose a two-level enhancement for use of an access device.  (ER 26-27, 398-422.)

## C.   **Defendant's Sentencing Claim is Meritless**

Defendant claims that the Court erred at sentencing because it applied a loss amount that was attributed to more than 250 victims yet applied a victim enhancement that applies to victimizing 50-250 individuals.  (Mot. 39-42.)  According to defendant, this means the Court improperly estimated the number of victims and he is entitled to resentencing.  Defendant's claim is frivolous.  The court found that there was sufficient evidence to conclude that defendant caused more than $20,000,000 in loss and victimized at least 277 victims but

---

[17] Counsel argued at sentencing that it did not apply and therefore it is unlikely that counsel gave the advice defendant claims but the court need not resolve the issue.

35

opted to impose sentence using more conservative figures so that it
did not further increase defendant's sentencing range.  See Supra at
24-25.  To the extent there was error on the victim calculation or
loss, it was to defendant's benefit and he cannot establish
prejudice.  The court's loss calcuations were supported by the
record, including a four day evidentiary hearing related to loss and
none of defendant's arguments undercut the court's analysis.  Given
these circumstances, defendant cannot establish error or prejudice.

    **D.  Defendant's Rule 32 is Procedurally Barred and Meritless**

    Defendant claim that the Court failed to permit allocution at
sentencing is frivolous.  (Mot. at 49-51.)  Defendant's claim is
procedurally barred because he failed to raise it on direct appeal.
Defendant's claim is entirely contradicted by the record.  Defendant
had ample opportunity to address the court and submit materials for
the court to review.  The court held a four day sentencing hearing
where defendant took the witness stand testified about mitigating
circumstances.  The court also continued sentencing multiple times in
order for defendant to gather any materials he needed for sentencing.
Defendant's motion concedes prior to sentencing the court told
defendant that he had a further opportunity to allocute.  The court
was not required to further delay the proceedings for defendant to
gather additional material.

    **E.  Any Other Claims Are Barred Because Defendant Procedurally
        Defaulted on Them and Cannot Establish Prejudice**

    The government has addressed defendant's ineffective assistance
of counsel claims and the other claims that it could decipher from
his motion.  To the extent that defendant is attempting to advance
other claims, they were not raised on direct appeal and therefore

procedurally barred unless defendant can establish factual innocence. Defendant cannot establish prejudice because the evidence of his guilt is overwhelming.

      **F.    A Certificate of Appealability Should Not Issue**

      Defendant has not "made a substantial showing of the denial of a constitutional right" as to any of these issues, which is required if defendant is to obtain a certificate of appealability in order to appeal this court's ruling. <u>See</u> 28 U.S.C. §§ 2253(c)(2), (c)(3). The government therefore requests that this Court deny any request for a certificate of appealability that may follow.

**V.   CONCLUSION**

      For the foregoing reasons, the government respectfully requests that this Court deny defendant's motion for relief under 28 U.S.C. § 2255 in its entirety and deny any ensuing request for a certificate of appealability.