THE JUSTICE FIRM
Joseph Virgilio, Esq.  (SBN: 139376)
5850 Canoga Avenue, 4th Floor
Woodland Hills, California 91367
Telephone: (310) 914-2444

DARDEN LAW GROUP APC
Christopher Darden, Esq. (SBN: 94959)
11500 West Olympic Boulevard, Suite 400
Los Angeles, CA 90064
Telephone: (310) 654-3369

Attorneys for:      Lewellyn Cox
                    Defendant

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>                    Plaintiff,<br><br>vs.<br><br>LEWELLYN COX<br><br>                    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No.:      8:20-CV-02064-DOC<br>Assigned to the Hon. Judge David O. Carter<br><br>DEFENDANT LEWELLYN COX'S<br>SUPPLEMENTAL BRIEF REGARDING<br>INCOMPETENCE OF COUNSEL /<br>PROSECUTORIAL MISCONDUCT;<br>DECLARATION OF LEWELLYN COX IN<br>SUPPORT THEREOF |

I.

<u>INTRODUCTION</u>

One of the fundamental claims in Defendant Lewellyn Cox's 28 US §2255 Petition is that his guilty plea was not voluntary due to incompetent legal advice provided by his trial counsel.  As set forth below, a critical factor influencing Cox's decision to plead guilty was photographic evidence in a six-pack lineup introduced by the prosecution.   Rather than challenging this evidence, Cox's then counsel stated: "it's you in the picture I'm not going to argue that it isn't you" (Cox Petition, page 8).

The prosecution introduced testimony from government witness Wesley Schwark that Ms. Bacque identified and signed the photographic six-pack lineup in November of 2005 (Exhibit 1).

After multiple Freedom of Information requests, Defendant Cox has recently obtained new evidence which conclusively establishes that the photographic line-up introduced by the prosecution in his case and signed by Jessica Bacque was fabricated in order to obtain his conviction (Declaration of Lewellyn Cox, paragraphs 1 and 2, including Exhibit 2 - photograph taken in 2008). The newly obtained evidence, pursuant to Defendant Cox' Freedom of Information requests, conclusively demonstrates that the photograph was not taken for another three years, in 2008. Prosecution witness Wesley Schwark testified that multiple other witnesses – specifically, Guadalupe Mendoza, Brandon Pettus, Yolanda Magana and Ronisha Jessie – were also shown and "signed" the photographic six-pack lineup in 2005 and 2006 (See Exhibits 4 through 8). The photograph of Lewellyn Cox in those exhibits was not taken until 2008, and the supposed evidence are additional fabrications.

Had Defendant Cox been properly represented by his counsel and been shown a legible copy of the falsified "2005" photographic six-pack lineup, he would have been able to establish the fabrication earlier and would not have pled guilty.

II.

<u>PROSECUTORIAL MISCONDUCT</u>

It is well established that misconduct occurs if a prosecutor introduces evidence that is false or inadmissible. See <u>Towery v. Schiro</u>, (2010) 622 F.3d 1237; <u>Napue v. Illinois</u> (1959) 360 U.S. 264 and <u>Mooney v. Holohan</u>, (1935) 294 U.S. 103.

"A criminal conviction procured by the state prosecuting authorities solely by the use of perjured testimony known by them to be perjured and knowingly used by them in order to procure

the conviction, is without due process of law and in violation of the Fourteenth Amendment." Mooney v. Holohan, (1935) 294 U.S. 103.

"The established principle that a State may not knowingly use false testimony to obtain a tainted conviction does not cease to apply merely because the false testimony goes only to the credibility of the witness." Napue v. Illinois (1959) 360 U.S. 264.

III.

CONCLUSION

A terrible injustice has occurred in this case.

Absent the introduction of the falsified six-pack, Defendant Lewellyn Cox would never have pled guilty.  It was not until well after sentencing that Defendant Cox was first shown the six-pack lineup shown to and allegedly signed by Jessica Bacque in November of 2005.  After multiple Freedom of Information requests, Defendant Cox has recently (and finally) obtained the photograph from the Government which was used in the "2005" lineup.  As accurately indicated by the California Department of Corrections and Rehabilitation, Departmental Archives Unit, that photograph of Defendant Cox was actually taken in 2008.

Defendant Cox's guilty plea was predicated on the introduction of the fabricated six-pack evidence, and as such was not a knowing and voluntary plea.

DATED:                                    THE JUSTICE FIRM

                                 By:   *Joseph a. Virgilio*
                                       _____
                                       Joseph Virgilio
                                       Attorney for Defendant Lewellyn Cox

## DECLARATION OF LEWELLYN COX

I, Lewellyn Cox, declare as follows:

I have personal knowledge of the matters set forth in this Declaration, and if called upon and sworn as a witness herein, I could and would testify competently as to said matters.

1.      I understand that Sur-replies / Supplemental Briefs are not always permitted, and I am appreciative that the Court has given me this opportunity.  My willingness to plead guilty in this case was based upon the repeated representations made to me by both the prosecution and my own attorney that Jessica Bacque and other witnesses identified me in 2005 as an active participant in the fraudulent bank activity.  It was only after my sentencing that I was able to obtain a copy of the purported "2005" six-pack lineup allegedly signed in 2005 by Jessica Bacque and others. Prior to sentencing, I was only shown a "blacked out" photocopy of the "2005" lineup.  Rather than challenging this evidence, my counsel, Thomas Wolfsen, stated: "it's you in the picture I'm not going to argue that it isn't you" (Cox Petition, page 8).

2.      The prosecution repeatedly represented to the Court and me that it had evidence, including a six-pack photographic line-up physically signed by Jessica Bacque and other witnesses who, in 2005, identified me as being involved in the fraudulent check scheme as of that year.  One example is included in the Government's Opposition to the present Petition, where the Government claims to have obtained statements in 2005 while simultaneously having those witnesses sign their names and dates on a "2005" six-pack photographic line-up.  Opposition:

> "...a motion by defendant for a bill of particulars; and a motion by defendant to suppress photographic identifications of defendant made by various runners in 2005, including Jessica Bacque. (ER 403; GER 311-13, 340, 358, 370.)" (Opposition, page 15 of 41, lines 7 through 10)

3. The purported 2005 signed six-pack is a fabrication. Attached for convenience as Exhibit 1 is a true and correct copy of the six-pack lineup which the prosecution has repeatedly represented to this Court and me was signed by Jessica Bacque and other witnesses in 2005. **The photograph of me in that six-pack was not taken until 2008**.

4. After my sentencing and after seeing a "non-blacked out" clear copy of the purported 2005 six-pack, I vigorously began a campaign to try to obtain the original "mug shot" used in that six-pack. After multiple requests for production and multiple Freedom of Information requests, I belatedly received a response from the California Department of Corrections and Rehabilitation – Departmental Archives Unit. That response included the photograph of me which was included as part of the supposed 2005 six-pack lineup. As correctly stated on that photograph by the Department of Corrections, it was taken on October 30, 2008. A true and correct copy of that photograph is attached as Exhibit 2.

5. Government witness, Wesley Schwark testified in the Suppression Hearing that Jessica Bacque and others were interviewed by him and shown the purported 2005 six-pack lineup by him in November of 2005. Attached for convenience as Exhibit 3 is a true and correct copy of the June 27, 2014 testimony of Wesley Schwark (8:09-CR-0248-DOC, pages 74 through 100). The government represented to this Court that Ms. Bacque signed a photograph and identified me in November of 2005 (Exhibit 3, page 100, line 13) despite the fact that the photograph did not exist for another three years.

6. Ms. Bacque herself testified that she did not sign the six-pack in 2005 when she took the witness stand at the suppression hearing but little other information was gained from her testimony because she then pled the 5th Amendment and refused to elaborate.

7.     In addition to Ms. Bacque, the prosecution presented additional false identifications.  Specifically, Guadelupe Mendoza, Brandon Pettus, Yolanda Magana and Ronisha Jessie were also presented and allegedly signed the fabricated 2005 six-pack lineup.  Guadelupe Mendoza's signature appears on Exhibit 4, Brandon Pettus' signature appears on Exhibit 5, Yolanda Magana's signature appears on Exhibit 6, and Ronisha Jessie's signature appears on Exhibit 7.   All of these supposed signatures and accompanying statements were represented by the prosecution to be true and correct witness identifications as of 2005, yet the photograph used in these line-ups was taken in 2008.  Agent Schwark falsely testified that he interviewed and witnessed Mendoza and Magana sign the 2005 six-pack lineup in 2005 even though that document could not have existed for another three years.  (Exhibit 3, page 79, line 23 through page 80, line 3 and page 84, line 20 to page 85, line 9).

8.     Agent Schwark claims to have interviewed Brandon Pettus in 2006 while having him sign the six-pack (Exhibit 3, page 90, lines 23 through 24) a blatantly false statement given that the six-pack contains the photograph taken in 2008.

9.     Ronisha Jessie has subsequently denied any contact whatsoever with Agent Schwark.  Her notarized statement reads: "My name is Ronisha Jessie.  I'm writing to clarify that I never met Agent Weslie Schwark and was never asked to view any six-pack of photos in 2005. The only time I was questioned was in late 2009 by Agent James Mikkelson.  It was in 2009 I was asked to identify a person in a six-pack.  I felt pressured to pick the person that after Agent Mikkelson pointed to the photo."  Ms. Jessie signed that notarized statement under penalty of perjury, and that document is attached for convenience as Exhibit 8.  Ms. Jessie's statement and Exhibit 7 (the "2005" six-pack) conclusively establish that Agent Schwark lied when he testified that he interviewed Ronisha Jessie on November 4, 2005 (Exhibit 3, page 86, lines 18 through 19).

1 | 10.    I would never have pled guilty to the charges against me absent the fabricated
2 | evidence.
3 | I declare under penalty of perjury of the laws of the State of California that the foregoing
4 | is true and correct.
5 | Executed this __11th day of November, 2021, at __Beaumont,__ Prison__.
6 | 
7 | _____
8 | Lewellyn Cox
9 | Declarant

## <u>PROOF OF SERVICE</u>

### STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the county of Los Angeles, State of California. I am over the age of eighteen and not a party to this litigation. My business address is 5850 Canoga Avenue, 4th Floor, Woodland Hills, California 91367

On   11/12/21  , I served the foregoing document described below as **DEFENDANT LEWELLYN COX'S SUPPLEMENTAL BRIEF** on the interested parties to this action:

[   ] (BY PERSONAL SERVICE) I delivered such envelope by hand to counsel for the parties as set forth below:

[   ] (BY MAIL) I placed a true and correct copy of the above document in an envelope, postage prepaid, first-class to the address below:

> United States Attorney's Office      Telephone: (213) 894-2272
> Central District of California        Facsimile: (213) 894-2500
> 312 North Spring Street          Email: joseph.mcnally@usdoj.gov
> Los Angeles, California 90012
> Attn: Joseph T. McNally, Esq.
>       Assistant U.S. Attorney

[ ✓ ] (VIA ELECTRONIC MAIL) I transmitted a true and correct copy of the above document via electronic mail to the address below:

[   ] (BY EXPRESS MAIL COURIER) I placed a true and correct copy of the above document in an envelope, postage prepaid, and deposited the envelope in a box regularly maintained by the courier for overnight delivery:

[   ] (BY TELECOPIER TRANSMISSION) I transmitted said document via telecopier transmission (FAX) to counsel for the party set forth above.

[XX] (State) I declare under penalty of perjury pursuant to the laws of the State of California that the above is true and correct.

  Joseph Virgilio, Esq.            _Joseph A. Virgilio_
(Type or print name)                       Signature

# EXHIBIT 1

DOJ CAL-PHOTO IMAGE NETWORK LINE-UP

Case 8:09-cr-00248-DOC   Document 312-3   Filed 07/15/11   Page 2 of 9   Page ID #:1527

Exhibit B



# EXHIBIT 2

Name: COX, LLEWELYN C.
Offender Photograph

CDC #: F23780  PID #: 11197148
Friday August 20, 2021 01:51:10 PM

Date Taken*:  10/30/2008
Source*:  State Parole Office
Type*:  Front View
Date ID Card Printed:  08/20/2021

Time Taken*:  15:41:25
Facility/Office:

Card Sequence:  0



Show Last Updated Information

# EXHIBIT 3

```
 1              THE COURT:  Thank you, sir.  If you would take the
 2   witness stand just to my left.  After you're comfortably
 3   seated, would you state your full name, sir, and spell your
 4   last, please.
 5              THE WITNESS:  Wesley Schwark, S-C-H-W-A-R-K.
 6              THE COURT:  Thank you.
 7              Counsel, direct examination, please.
 8                         DIRECT EXAMINATION
 9   BY MR. McNALLY:
10   Q.    Good afternoon, sir.  What do you do for a living?
11   A.    I'm a U.S. Secret Service Agent assigned to the
12   dignitary protection detail in Washington D.C.
13   Q.    And prior to being in your current assignment, what did
14   you do?
15   A.    I was on the President's detail, and then prior to
16   that, I was assigned here in Santa Ana from 2004 to 2007.
17   Q.    All right.  Were you the initial case agent on this
18   case?
19   A.    I was.
20   Q.    I want to talk to you about your investigation and how
21   it began.  Why don't you just tell us how Mr. Cox -- how you
22   became involved in the investigation?
23   A.    Back in June of 2005, I received a phone call from the
24   Orange County Sheriff's Department.  Detective Kurt Kasler
25   had been working a fraud case.  Orange County Sheriff's
```

```
 1   Department had received some reports from Bank of America
 2   they had received over $245,000 in losses between April of
 3   '05 and June of '05.
 4         The case was very widespread, and Detective Kasler
 5   believed there might be a gang nexus.  It was really a
 6   little bit bigger than he could handle by himself, and it
 7   was not assigned to a task force.  So he thought there might
 8   be a federal nexus.  We might be able to help him out.
 9   Q.   You agreed to work with him?
10   A.   Yes, I did.
11   Q.   I want to turn specifically to Defendant Cox and talk
12   about how Defendant Cox came on your radar during the course
13   of the investigation.
14   A.   During the course of the investigation and through
15   various interviews, we had learned of an arrest of a young
16   lady out in Pomona.  And we got -- received a phone call
17   from her boyfriend, which at the time we had termed her
18   handler.  Basically, she was a "bofa", and he was the one
19   who was managing her.
20   Q.   What was his name?
21   A.   His name was Adam Jones.  Adam Jones, uh, related to us
22   that he had, uh, known a guy by the name of "Homicide" or he
23   also called him "Money".  And that he had been asked to
24   recruit people to go cash checks for them.
25         At one point he had met "Homicide" in South Coast Plaza
```

8:09-CR-0248-DOC - 6/27/2014 - Item No. 1

76

```
 1   parking lot in an attempt to conduct some fraud.  They were
 2   exchanging checks and stuff.  The activity while they were
 3   in the parking lot drummed up suspicion from the security at
 4   the mall --
 5   Q.   Okay.
 6   A.   -- when Adam had told us about this, we contacted the
 7   mall security and asked them if in their log records on that
 8   particular date that they had any records of the suspicious
 9   activity.  They provided us with a license plate.
10   Q.   So let me just stop you.  You interview Adam Jones.
11   Adams Jones identifies "Homicide" and says he was there
12   cashing or receiving checks from "Homicide" and some others?
13   A.   Correct.
14   Q.   You mentioned security, so you do follow up with
15   security?
16   A.   Correct.
17   Q.   And what did the security folks tell you?
18   A.   So the security folks, they actually said, yeah, we did
19   have an incident on that date.  We saw these people meeting.
20   We wrote down a license plate.  We got the license plate.
21   We ran it.  The license plate came back to Jamala Pratt.
22   Q.   Okay.  License plate to Jamala Pratt.  I'm sorry.
23        So license plate comes back to Jamala Pratt.  Do you
24   remember what kind of car it was?
25   A.   It was a silver Mercedes.
```

1  Q.   Were you able to develop any type of relationship

2  between Jamala Pratt and Lewellyn Cox?

3  A.   By running that license plate through our data base,

4  our Secret Service database, we found an association between

5  Jamala Pratt and Lewellyn Cox.

6            THE COURT:  Now, just a moment.

7            So you run the silver Mercedes plate that the

8  security at the mall has taken down, because apparently

9  Jamala Pratt is associated with that automobile.  And you

10  run that plate and find out what?

11            THE WITNESS:  Sorry, sir.  We run her name through

12  our index.

13            THE COURT:  Okay.

14            THE WITNESS:  And her name is associated to

15  another case.  And it's an identity theft case out of Irvine

16  Toyota.

17            THE COURT:  It's what kind of theft?

18            THE WITNESS:  Fraud.

19            THE COURT:  Fraud theft out of Irvine Toyota.

20            THE WITNESS:  Yes, sir.

21            THE COURT:  Thank you.  Counsel.

22            THE WITNESS:  In fall --

23  BY MR. McNALLY:

24  Q.   Let me just ask you.

25            What did you learn was the relationship between

1   Lewellyn Cox and Jamala Pratt?

2   A.    They were either boyfriend-girlfriend or husband-wife.

3   It was some sort of spousal or -- or -- relationship.

4            MR. McNALLY:    And just for the record, Your Honor,

5   Jamala Pratt previously testified at a hearing a couple of

6   weeks ago.

7   BY MR. McNALLY:

8   Q.    And so based on that association and determining that

9   this car that you saw or was told -- let me ask you.   Step

10  back.   I'm asking -- asking it in a bad way.

11        You heard about "Homicide."   What did, um, Mr. Jones

12  say to you -- Adams Jones say to you about what else

13  "Homicide" was doing?

14  A.    He had said that he was also involved in recruiting and

15  cashing checks as well.

16  Q.    Did he say if anybody was with "Homicide" in that

17  silver Mercedes that day?

18  A.    He said that there was another black male, but he did

19  not recognize him.

20  Q.    Okay.   Were you able to ever show Mr. Jones a

21  photograph of Mr. Cox?

22  A.    So -- we did.   Once we found the relationship between

23  that silver Mercedes and Lewellyn Cox through Jamala Pratt's

24  name, we showed him a photograph of Lewellyn Cox.   And he

25  said that's looks like the guy that was in the car with

1  "Homicide."

2          MR. WOLFSEN:  Excuse me, Your Honor.  Could we

3  have a copy of that lineup?

4          THE COURT:  I'm sorry?

5          MR. WOLFSEN:  I haven't -- I have not seen a copy

6  of that lineup.  So I am curious as to whether or not

7  there's one that the prosecution --

8          THE COURT:  Why don't you talk to the Government

9  for just a moment?

10         (Counsel confer.)

11  BY MR. McNALLY:

12  Q.   All right.  Let me turn to -- let me step back.

13       So based on that initial driver's -- or license plate,

14  Lewellyn Cox came on your radar, I guess so to speak, as a

15  potential suspect in the case?

16  A.   Correct.

17  Q.   Let me turn to Exhibit 6.

18       Do you have the exhibit binder in front of you, Special

19  Agent Schwark?

20  A.   I do.

21  Q.   Are you familiar with a person named Guadalupe Mendoza?

22  A.   I am.

23  Q.   Okay.  And who is Guadalupe Mendoza?

24  A.   Guadalupe Mendoza was brought to our attention by Bank

25  of America after he was arrested for cashing checks in

```
 1    "Homicide."

 2            MR. WOLFSEN:  Excuse me, Your Honor.  Could we

 3    have a copy of that lineup?

 4            THE COURT:  I'm sorry?

 5            MR. WOLFSEN:  I haven't -- I have not seen a copy

 6    of that lineup.  So I am curious as to whether or not

 7    there's one that the prosecution --

 8            THE COURT:  Why don't you talk to the Government

 9    for just a moment?

10        (Counsel confer.)

11    BY MR. McNALLY:

12    Q.   All right.  Let me turn to -- let me step back.

13         So based on that initial driver's -- or license plate,

14    Lewellyn Cox came on your radar, I guess so to speak, as a

15    potential suspect in the case?

16    A.   Correct.

17    Q.   Let me turn to Exhibit 6.

18         Do you have the exhibit binder in front of you, Special

19    Agent Schwark?

20    A.   I do.

21    Q.   Are you familiar with a person named Guadalupe Mendoza?

22    A.   I am.

23    Q.   Okay.  And who is Guadalupe Mendoza?

24    A.   Guadalupe Mendoza was brought to our attention by Bank

25    of America after he was arrested for cashing checks in
```

1    Whittier.  He was arrested by Whittier PD.

2    Q.    Did you interview him at some point?

3    A.    I did.  I introduced him on November 2nd of 2005.

4    Q.    And approximately when did he cash those fraudulent

5    checks?

6    A.    I believe it was September 28th of '05, so

7    approximately a month and -- or six weeks prior possibly.

8    Q.    Okay.  And did you show him a six-pack?

9    A.    I did.

10   Q.    And did that six-pack contain a photograph of Lewellyn

11   Cox?

12   A.    It did.

13   Q.    Okay.  And prior to showing him that six-pack, did you

14   read him an admonishment of -- United States Secret Service

15   Standard Admonishment?

16   A.    I did.

17   Q.    Okay.  And what was that admonishment?

18   A.    (Reading:)

19              "In a moment, I'm going to show you a

20              group of photos.  This group of

21              photographs may or may not contain a

22              photograph of the person who committed

23              the crime now being investigated.  Keep

24              in mind that hairstyles, beards,

25              mustaches may easily change.  Also,

```
 1                    photographs may not always depict the
 2                    true complexion of a person.  It might
 3                    be lighter or darker than shown in the
 4                    photo.  Pay no attention to any markings
 5                    or numbers that may appear on the
 6                    photograph or any other differences in
 7                    the type or style of the photographs.
 8                    "When you have looked at all of the
 9                    photos, tell me whether or not you see
10                    the person who committed the crime.  Do
11                    not tell other witnesses that you have
12                    or have not identified anyone."
13    Q.   Okay.  And what did Mr. Mendoza say to you?  And then
14    I'll go to his six-pack selection.
15    A.   He indicated to me that the person he identified was
16    the person who was driving the white Jaguar and eventually
17    drove him around to cash checks.
18                    THE COURT:  And that was identified as Mr. Cox?
19                    THE WITNESS:  Yes, sir.
20    BY MR. McNALLY:
21    Q.   And if you'd take a look at Exhibit 6, is that the
22    photograph lineup that you showed him, and is that his
23    signature on the lineup, and is Mr. Cox depicted as No. 4?
24    A.   That's correct.
25    Q.   And on there he writes, "was driver of white Jaguar; he
```

1    wrote the check"?

2    A.    Correct.

3    Q.    Did you ever suggest on there in any ways which guy he

4    was supposed to pick?

5    A.    No.

6    Q.    Okay.  Let me turn to Exhibit 7-A.

7          Are you familiar with a person named Jessica Bacque?

8    A.    I am.

9    Q.    And did you interview Ms. Bacque?

10   A.    I did.

11   Q.    And what were the circumstances under which you

12   interviewed her?

13   A.    Jessica Bacque had been arrested prior to me taking

14   this case on.  Detective Curt Kasler advised that it might

15   be good to go back and interview her again.  She might have

16   some pertinent information in the case.

17         So on November 3rd or thereabout, we went out to

18   San Bernardino and met her in a parking lot.  We interviewed

19   her.  I showed her a couple six-pack photos where she was

20   able to identify several of the suspects in this case.

21   Q.    Okay.  Who did she identify?

22   A.    She identified Angus Brown, Obediah Baldwin, and

23   Lewellyn Cox.

24   Q.    Okay.  And if you take a look at Exhibit 7; depicted

25   she circles No. 4, Jessica Bacque, "passenger of white car

1    wrote the check"?

2    A.    Correct.

3    Q.    Did you ever suggest on there in any ways which guy he

4    was supposed to pick?

5    A.    No.

6    Q.    Okay.  Let me turn to Exhibit 7-A.

7          Are you familiar with a person named Jessica Bacque?

8    A.    I am.

9    Q.    And did you interview Ms. Bacque?

10   A.    I did.

11   Q.    And what were the circumstances under which you

12   interviewed her?

13   A.    Jessica Bacque had been arrested prior to me taking

14   this case on.  Detective Curt Kasler advised that it might

15   be good to go back and interview her again.  She might have

16   some pertinent information in the case.

17         So on November 3rd or thereabout, we went out to

18   San Bernardino and met her in a parking lot.  We interviewed

19   her.  I showed her a couple six-pack photos where she was

20   able to identify several of the suspects in this case.

21   Q.    Okay.  Who did she identify?

22   A.    She identified Angus Brown, Obediah Baldwin, and

23   Lewellyn Cox.

24   Q.    Okay.  And if you take a look at Exhibit 7; depicted

25   she circles No. 4, Jessica Bacque, "passenger of white car

1    Jag, 5/16/05."

2         Did you witness her write that in your presence?

3    A.   I did.

4         THE COURT:  And who was this again doing the

5    identification?

6         MR. McNALLY:  Jessica Bacque.

7         THE COURT:  Jessica Bacque.  Once again, tell me

8    who Jessica Bacque is.

9    BY MR. McNALLY:

10   Q.   Could you explain what Ms. Bacque, um -- what her role

11   is or what she did?

12        THE WITNESS:  Your Honor, she had previously been

13   arrested, charged, and convicted for cashing fraudulent,

14   unauthorized checks.

15        THE COURT:  Bank of America?

16        THE WITNESS:  Yes, Your Honor.

17        THE COURT:  Thank you.

18   BY MR. McNALLY:

19   Q.   And you interviewed her and asked who provided that,

20   and she identified?

21   A.   She identified Angus Brown, Obediah Baldwin, and

22   Lewellyn Cox.

23   Q.   And identified "Homicide," Angus Brown, and Obediah

24   Baldwin in six-packs that you showed her?

25   A.   Correct.

 1   Jag, 5/16/05."

 2        Did you witness her write that in your presence?

 3   A.   I did.

 4             THE COURT:  And who was this again doing the

 5   identification?

 6             MR. McNALLY:  Jessica Bacque.

 7             THE COURT:  Jessica Bacque.  Once again, tell me

 8   who Jessica Bacque is.

 9   BY MR. McNALLY:

10   Q.   Could you explain what Ms. Bacque, um -- what her role

11   is or what she did?

12             THE WITNESS:  Your Honor, she had previously been

13   arrested, charged, and convicted for cashing fraudulent,

14   unauthorized checks.

15             THE COURT:  Bank of America?

16             THE WITNESS:  Yes, Your Honor.

17             THE COURT:  Thank you.

18   BY MR. McNALLY:

19   Q.   And you interviewed her and asked who provided that,

20   and she identified?

21   A.   She identified Angus Brown, Obediah Baldwin, and

22   Lewellyn Cox.

23   Q.   And identified "Homicide," Angus Brown, and Obediah

24   Baldwin in six-packs that you showed her?

25   A.   Correct.

1    Q.    If you take a look at Exhibit 7-A in your binder.   This

2    is a single photograph bearing Jessica Bacque's signature.

3    It's dated 5/16/05 -- or, I'm sorry.   It's dated 11/2/05.

4    It's a single photograph that you showed.   One of the things

5    Mr. Cox has contended is that you showed the single

6    photograph first and then the six-pack.

7         Could you tell us the order that you did this lineup

8    in?

9    A.    We showed the six-pack first.   And then after she had

10   selected Mr. Cox in the six-pack photo, we showed her the

11   individual photo of Mr. Cox with his glasses on.

12        We had noted that in our investigation some of the

13   witnesses were -- uh, it helped confirm their -- their

14   choosing of a witness once they chose 'em out of the

15   six-pack.   "Oh, yeah, that's the glasses.   That's for sure

16   who it was."

17   Q.    Okay.   Take a look at Exhibit 8.

18        Are you familiar with an individual Yolanda Magana?

19   A.    I am.

20   Q.    And did you have the opportunity to interview

21   Ms. Magana?

22   A.    I interviewed Yolanda Magana at the Orange County

23   Sheriff's jail.

24   Q.    Okay.   And approximately -- well, what was the purpose

25   of your interview?

1  Q.   If you take a look at Exhibit 7-A in your binder.  This

2  is a single photograph bearing Jessica Bacque's signature.

3  It's dated 5/16/05 -- or, I'm sorry.  It's dated 11/2/05.

4  It's a single photograph that you showed.  One of the things

5  Mr. Cox has contended is that you showed the single

6  photograph first and then the six-pack.

7       Could you tell us the order that you did this lineup

8  in?

9  A.   We showed the six-pack first.  And then after she had

10 selected Mr. Cox in the six-pack photo, we showed her the

11 individual photo of Mr. Cox with his glasses on.

12      We had noted that in our investigation some of the

13 witnesses were -- uh, it helped confirm their -- their

14 choosing of a witness once they chose 'em out of the

15 six-pack.  "Oh, yeah, that's the glasses.  That's for sure

16 who it was."

17 Q.   Okay.  Take a look at Exhibit 8.

18      Are you familiar with an individual Yolanda Magana?

19 A.   I am.

20 Q.   And did you have the opportunity to interview

21 Ms. Magana?

22 A.   I interviewed Yolanda Magana at the Orange County

23 Sheriff's jail.

24 Q.   Okay.  And approximately -- well, what was the purpose

25 of your interview?

1    A.    Again, she had been arrested and convicted of cashing

2    an unauthorized check, Bank of America.

3    Q.    And approximately how long after her fraudulent check

4    cashing did you interview her?

5    A.    Um, we interviewed her on November 17th. I'd have to

6    refresh my memory on when she was, um -- I'm not exactly

7    sure of the date in which she was arrested.

8           THE COURT:  Well, what year?

9           THE WITNESS:  It would have been in '05, sir.

10          THE COURT:  Okay.

11    BY MR. McNALLY:

12    Q.    Okay.  And did you read -- with all these witnesses,

13    did you read your standard Secret Service admonishment?

14    A.    We did.  Except for in this particular case, I read

15    the -- we read to her the Orange County Sheriff's

16    admonishment.

17    Q.    Which is similar?

18    A.    Which is basically the same thing.

19    Q.    Okay.  And did Mr. Magana select Mr. Cox and identify

20    him?

21    A.    She did.

22    Q.    Okay.  And what did she tell you?

23    A.    She told us that he was the one who gave her the check,

24    and additionally, he was also the one that drove her to the

25    bank.

1    Q.    And did you ever sign that six-pack?

2    A.    Yes, I did.

3    Q.    Take a look at Exhibit 9.

4          Are you familiar with an individual named Ronisha

5    Jessie?

6    A.    Yes.

7                THE COURT:  Spell that for me, please.

8                MR. McNALLY:  Sure.

9                Actually, Special Agent Schwark, can you spell her

10   first name so I don't botch it.

11               THE WITNESS:  Sure.

12               R-O-N-I-S-H-A and J-E-S-S-I-E.

13               THE COURT:  Thank you very much.

14   BY MR. McNALLY:

15   Q.    Did you interview her about some fraudulent checks that

16   were cashed?

17   A.    I did.

18   Q.    Okay.  And approximately when was that interview?

19   A.    I conducted that on November 4th of '05.

20   Q.    And when was the fraudulent check cashing that she

21   committed?

22   A.    That was approximately October 26th of '05.

23   Q.    So about -- you interviewed her about a month after the

24   incident?

25   A.    Correct.

DEBBIE GALE, U.S. COURT REPORTER

1   Q.    And what'd she tell you?

2   A.    She related that she had been approached at a 7-Eleven

3   in L.A. County by a guy that she only knew as "Show."  That

4   she was asked to open up a business account.  She was picked

5   up and driven out to -- I think it was somewhere near

6   Diamond Bar, where she was -- uh, opened up this business

7   account.  She was provided all the DBA papers, and the

8   business was Jessie's Horse Training.  And to establish this

9   account, she made a $35,000 deposit.

10  Q.    Did she tell you who provided her the check to make --

11  so she's instructed to open up this account at the bank.

12        Did she tell you who provided her the $35,000 check?

13  A.    She said that -- "Show."

14  Q.    Okay.  What else she tell you?

15        THE COURT:  Just a moment.

16        Did she say, I mean, that this was negotiable,

17  $35,000, that Show had given to her; that she could actually

18  make a deposit?

19        THE WITNESS:  I'm sorry, Your Honor.  I don't

20  understand the question.

21        THE COURT:  In other words, when she went into the

22  bank to make this deposit, that was real money; she could

23  actually make a deposit?

24        THE WITNESS:  She made the deposit, and then the

25  rest of the story:  She was taken from the bank and then

1  taken around to various other Bank of Americas and asked to
2  make cashier's check withdrawals right away once the money
3  was deposited.
4        MR. WOLFSEN:  Your Honor, these identifications
5  and what they said are certainly hearsay, and I certainly
6  object to them on the basis of hearsay.
7        THE COURT:  Overruled.
8        MR. WOLFSEN:  Make a motion to strike.
9        THE COURT:  It's denied.
10 BY MR. McNALLY:
11 Q.   She told you that she was then instructed to make small
12 withdrawals?
13 A.   She was instructed to make these cashier check
14 withdrawals, yeah, as she was driven from bank to bank.
15 Q.   She tell you who she provided that money to?
16 A.   She provided the money back to "Show."
17 Q.   Did you show her a six-pack?
18 A.   I did.
19 Q.   Okay.  Did she point out the person that she knew as
20 "Show"?
21 A.   Yes.
22 Q.   Is that depicted in Exhibit 9?
23 A.   That's correct.
24 Q.   And to the left of No. 4 in Exhibit 9 where -- is that
25 Mr. Cox's photograph?

```
 1   A.    It's Mr. Cox's photograph, and to the left of the
 2   photo, she wrote the name that she knew him by as "Show."
 3   Q.    And then signed her name?
 4   A.    Correct.
 5   Q.    In your presence?
 6   A.    Correct.
 7              THE COURT:   So, in other words, when we start
 8   dealing, from your perspective back in 2005, what I'm
 9   getting is the feeling that there was even substantial money
10   involved because this person has $35,000 immediately,
11   regardless of the eventual scam to get it back, to make a
12   deposit?
13              THE WITNESS:   Your Honor, that's correct.  And
14   that's why the sheriff's department called us, because it
15   was getting so big and so overwhelming for them.
16              THE COURT:   Yeah.  Okay.  Thank you.
17              Counsel.
18   BY MR. McNALLY:
19   Q.    Take a look at Exhibit 10.
20              MR. McNALLY:   Your Honor, I'm sorry.
21   BY MR. McNALLY:
22   Q.    Before I do that, let me ask you Exhibit 9-A is a
23   single photograph of Defendant Cox, and it has "Show"
24   written on the left-hand side and then Ms. Jessie's
25   signature.
```

```
 1          Did you show that photograph to Ms. Jessie?
 2   A.   I did.  Following showing her the six-pack, we showed
 3   her that photo.  It reconfirmed her, uh, her confidence that
 4   she'd picked the right person.  And again, it was merely to
 5   show him with glasses on.
 6   Q.   Okay.  Turn to Exhibit No. 10.
 7   A.   Okay.
 8   Q.   You familiar with an individual named Brandon Pettus?
 9   A.   I am.
10          THE COURT:  Just a moment.  Let's slow down.
11          Now, what is the name again?
12   BY MR. McNALLY:
13   Q.   Brandon, B-R-A-N-D-O-N.  Last name Pettus, P-E-T-T-U-S.
14          THE COURT:  U-S.
15          Thank you.
16          And the question was:  Are you familiar with
17   Brandon Pettus?
18          THE WITNESS:  I am.
19          THE COURT:  Thank you.
20   BY MR. McNALLY:
21   Q.   Is he an individual that you interviewed?
22   A.   He is.
23   Q.   Approximately when did you interview him?
24   A.   I interviewed him on February 29th of '06.
25   Q.   And did Mr. Pettus admit to cashing some fraudulent
```

```
 1   checks?

 2   A.    He did.  He cashed fraudulent checks in October of '06.

 3   Q.    And as --

 4   A.    I'm sorry.  Excuse me.  October of '05.

 5   Q.    October of '05.

 6         And you interviewed him when?

 7   A.    In February of '06.

 8   Q.    Okay.  And as part of that investigation -- well, what

 9   did he tell you when he interviewed you (verbatim)?

10   A.    He told me that he had been approached -- he and a

11   couple of his friends at school had been approached by

12   somebody, uh, recruited and asked if them wanted to make

13   some money.

14         The person who was recruiting him he knew only as John.

15   Later identified as Sterling Baldwin.

16   Q.    And let me stop you there.  You identified John later

17   as Sterling Baldwin.  You mentioned before that one of the

18   other witnesses picked out in a six-pack a guy named Obediah

19   Baldwin?

20   A.    Correct.  That's the brother of Sterling Baldwin.

21   Q.    And based on your investigation, were they working with

22   Cox in the check-cashing scheme?

23   A.    That's correct.

24   Q.    Okay.  So an individual named "John" recruited him.

25         What else did he say?
```

1    A.    Um, he said that he originally uh, had told these guys

2    he didn't want to do it, didn't want to do it.  They kept

3    putting pressure on him.  He would even say, I think, that

4    he felt intimidated.  Uh, so at one point, he decided that

5    he would go ahead and do it.

6         Um, he met them, uh, in a -- at a gas station out in

7    Riverside County.  He was approached by John and, um, then

8    he was approached by another individual, another black male

9    individual that he didn't know, but walked up to him and

10   said, "Oh, I heard all about you, All Star."  And that

11   really stuck in his mind because he didn't know who these

12   guys were.

13   Q.    Were those individuals, including the guy who said, "I

14   heard all about you, "All Star" -- were those the

15   individuals he said were involved in passing out the checks?

16   A.    He received the check from John, and he said that John

17   had received the check from the other individual.  He did

18   witness, uh, the other associates in the background were

19   exchanging brown boxes, but he didn't know what they were at

20   the time.

21   Q.    Okay.  And if you'd take a look at Exhibit 10, is that

22   a six-pack that you showed him?

23   A.    It is.

24   Q.    Does it depict Defendant Cox in No. 4?

25   A.    It does.

8:09-CR-0248-DOC - 6/27/2014 - Item No. 1

93

```
 1    Q.    Did he select Defendant Cox and sign this as depicted
 2    in Exhibit 10?
 3    A.    Yeah.  He stated to me that this might have been the
 4    person that said, "I know all about you, All Star."
 5    Q.    Did you show him the single photograph in 10-A?
 6    A.    I did.
 7    Q.    Did you do that before or after you showed him the
 8    six-pack?
 9    A.    After the six-pack.
10    Q.    And made the same -- he made the same statement?
11    A.    Correct.
12    Q.    Okay.  And so his identification was, um, that he
13    might; he didn't say it was positive?
14    A.    Correct.
15    Q.    Okay.
16          MR. McNALLY:  Your Honor, I believe all those
17    exhibits have already been admitted.  I don't have any
18    further questions for the agent.
19          THE COURT:  Cross-examination, please.
20                      CROSS-EXAMINATION
21    BY MR. WOLFSEN:
22    Q.    Special Agent Schwark.
23    A.    Yes, sir.
24    Q.    Do you recall interviewing a person by the name of
25    Carla Romano?
```

1    A.    I do.

2    Q.    And did you get a statement from her?

3    A.    I believe I did.  I don't know if I got a statement

4    from her, but I wrote down in my report that I interviewed

5    her.

6    Q.    And did you also show her photos?

7    A.    Um, I believe I showed her a six-pack.  And she was not

8    able to identify anybody.

9    Q.    And then you did -- then did you show her an individual

10   photo?

11   A.    Um, yes.

12   Q.    Do you have your report up there in front of you?

13   A.    I'm going to look for it, sir.

14            MR. McNALLY:  May I approach, Your Honor?

15            THE COURT:  You may.

16        (Document provided to the witness.)

17            THE WITNESS:  Thank you.

18            MR. WOLFSEN:  May I approach also, Your Honor?

19   BY MR. WOLFSEN:

20   Q.    Do you remember Ms. Romano making an identification of

21   Mr. Cox?

22   A.    No, she did not.

23   Q.    Do you recall showing her a six-pack?

24   A.    Yes.

25   Q.    And do you recall showing her an individual

1    photograph --

2    A.    Yes.

3    Q.    -- of Mr. Cox?

4    A.    Yes.

5    Q.    Now, Ms. Romano came into court, just for your

6    information, and said that when you came out and asked for

7    identification, you put 'em both down on the table at the

8    same time, put 'em both in front of her, both the single

9    photo and the six-pack.

10         But your testimony is, is that you don't do that?

11   A.    That did not happen.

12   Q.    So she's wrong?

13   A.    She's wrong.

14   Q.    By the way, does the Secret Service have a policy

15   procedure on how to show lineups?

16   A.    We do.

17   Q.    And do you get training in that?

18   A.    We do.

19   Q.    And isn't one of the main things that photo lineups,

20   show-ups, individual lineups, sometimes get the wrong

21   person?   It's --

22   A.    Sure.

23   Q.    It's not always a hundred percent accurate?

24   A.    Sure.

25   Q.    Do you know approximately what the percentage of

1    accuracy is?

2    A.    I have no idea.

3    Q.    How many times do you normally show a photograph to a

4    witness, the same lineup?

5    A.    Once.

6    Q.    Don't show it twice?

7    A.    No.

8    Q.    Is it the policy of the Secret Service, after they've

9    looked at the lineup, to give 'em an individual photograph?

10   A.    After they've identified somebody?

11   Q.    Yes.

12   A.    Or if they haven't identified somebody and you say,

13   Okay, well, you haven't identified anybody.  Let me show you

14   this.  Does this look like someone" -- obviously, you're not

15   gonna be able to use it in the lineup anymore.  You're not

16   going to be able to identify that person in the lineup

17   because now you've shown them who you're looking for --

18   Q.    But isn't --

19   A.    -- but if you're looking for a lead, yes.

20   Q.    Isn't one of the procedures that you don't indicate a

21   photo to pick out in the lineup; yes or no?

22   A.    Of course you're not gonna indicate who to pick out.

23   Q.    And what about the fact that you don't confirm or deny?

24   In other words, you don't tell them whether or not they've

25   picked out the right person.  Is that part of the procedure

1    of the Secret Service?

2    A.    You don't -- you don't tell them they've picked the

3    right person.  If they're signing it, you want them to make

4    the judgment on their own based on their own recollection.

5    They can sign it, and then, you know, you can say, "Okay.

6    What else can you tell me about this?"  And then it goes on.

7    Q.    So it's okay to say that they got the right person?

8    A.    Sure.  After they've picked that person.  After they've

9    picked a person.

10   Q.    Now, let's go to Exhibit 6 in the book.

11   A.    Okay.

12   Q.    And that's Mendoza, correct?  Guadalupe Mendoza?

13   A.    Yes.  This is the six-pack I had showed to Guadalupe

14   Mendoza.

15   Q.    And did you notice anything concerning Guadalupe

16   Mendoza, whether or not he was maybe a little slow?

17   A.    I indicated that in my report, yes.

18   Q.    I recall reading it.

19   A.    Yeah.

20   Q.    And didn't you have Tanya Green either help him, or she

21   kept books or records?

22   A.    She had kept notes for him, apparently, when he had

23   been cashing the checks, apparently.

24   Q.    Was she there at the time?

25   A.    She was not there, to my recollection, but we did

```
 1    interview her at a later date.  She was -- she was --
 2    Q.    You answered my question.
 3    A.    Okay.  Very good.  I'll tell you what the relationship
 4    was, but whatever...
 5    Q.    Well, it was an attempt by Mendoza to have a
 6    girlfriend, correct?
 7    A.    Exactly.
 8    Q.    But it wasn't -- it wasn't reciprocated?
 9    A.    Didn't seem like it.
10    Q.    Now, I'm looking at Guadalupe Mendoza's six-pack.  And
11    what I see is down at the -- or, I guess it's where you
12    look.  It's on the right side of the photographs.
13    A.    Yes.
14    Q.    And it says, "It was driver of the white Jaguar, he
15    wrote the check"?
16    A.    Correct.
17    Q.    Did Guadalupe Mendoza know how to write Jaguar?
18    A.    I guess he did because that's what he wrote.
19    Q.    Well, now I see the same thing written in your report.
20    A.    Right.
21    Q.    Mr. Mendoza says that he didn't know how to spell it
22    and asked you to write it out and spell it for him.
23          You recall that?
24    A.    No, I do not.
25    Q.    Now, my understanding on Jessica that we've been saying
```

1   Bacque or Bacque -- I think it's Bacque, but anyway, it's

2   spelled B-A-C-Q-U-E.  You went out and interviewed her,

3   didn't you?

4   A.   I did.

5   Q.   Okay.  How many times had she been interviewed before?

6   A.   That was the first time I interviewed her.  I believe

7   that was another case in which Detective Kasler had previous

8   contact with her.  By the time I had interviewed her, her

9   case had already been adjudicated and I believe she already

10  served her sentence in County.

11  Q.   Now, she was arrested on 5/23, correct?  You read the

12  arrest report on her?

13  A.   I believe that was correct, yeah.

14  Q.   And she was arrested, I think, by C. Brown?

15  A.   As far as the arresting officer?

16  Q.   Here, let me -- I have a copy of the report.

17          MR. WOLFSEN:  May I approach, Your Honor?

18          THE COURT:  You may.

19       (Documents provided to Government counsel, the

20    witness, and the Court.)

21  BY MR. WOLFSEN:

22  Q.   I'm looking at her photograph, the one you have, which

23  is Exhibit 7-A?

24  A.   Yes, sir.

25  Q.   What is this?  7 and 7-A?

1   A.   7 and 7-A.

2        You want the individual or you want the six-pack?

3   Q.   I think it's 7, which is the six-pack.

4   A.   Okay.

5   Q.   Now, this states interview was done on November 15th?

6   A.   It was on November 3rd.  The six-pack indicates that

7   she signed it on November 2nd, so it was thereabout the 2nd

8   or the 3rd, I guess.

9   Q.   Now, when you showed her the six-pack and she signed

10  her name, did she write all of that writing in there or did

11  she just sign her name?

12  A.   No, she wrote all that.

13  Q.   She wrote 11/2/05?

14  A.   Yes.

15  Q.   And said, "The passenger of the white car, Jag, on

16  5/16/05?

17  A.   Correct.

18  Q.   And she did the same thing on 6-A, correct?

19  A.   On 7-A.

20  Q.   I should -- I'm sorry.

21  A.   Correct.

22  Q.   Now, looking at the police report, she indicated she

23  cashed a check on 5/16, correct? -- on your photograph, 6-A.

24  A.   All right.

25  Q.   Or 7-A?

DEBBIE GALE, U.S. COURT REPORTER

# EXHIBIT 4

DOJ CAL-PHOTO IMAGE NETWORK LINE-UP

Page 1 of 1

Case 8:09-cr-00248-DOC   Document 312-3   Filed 07/15/11   Page 1 of 9   Page ID #:1526



**1.**  **2.**  **3.**

**4.**  **5.**  **6.**

11-3-05

was Driver of white Jaguar
He wrote the check

Exhibit A

http://167.10.34.14/calphoto/lineup.asp?sid=78374410182005CPH1818841

10/18/2005

# EXHIBIT 5

Case 8:09-cr-00248-DOC   Document 312-3   Filed 07/15/11   Page 7 of 9   Page ID #:1532

DOJ CAL-PHOTO IMAGE NETWORK LINE-UP

Page 1 of 1



1.     2.     3.

4.     5.     6.

Brandon Pettus
might have
been talking
to john

http://167.10.34.14/calphoto/lineup.asp?sid=78374410182005CPH1818841

Exhibit G

10/18/2005

# EXHIBIT 6

DOJ CAL-PHOTO IMAGE NETWORK LINE-UP

Case 8:09-cr-00248-DOC   Document 312-3   Filed 07/15/11   Page 4 of 9   Page ID #:1529

Exhibit D



**1.**



**2.**



**3.**



**4.**



**5.**



**6.**

*Yolanda Morgan*
*11/17/05*

http://167.10.34.14/calphoto/lineup.asp?sid=78374410182005CPH1818841

10/18/2005

# EXHIBIT 7

Case 8:09-cr-00248-DOC   Document 312-3   Filed 07/15/11   Page 5 of 9   Page ID #:1530

DOJ CAL-PHOTO IMAGE NETWORK LINE-UP

Page 1 of 1

Exhibit E



1.     2.     3.

4.     5.     6.

10/18/2005

# EXHIBIT 8

My name is Ronisha Jessie, I'm writing to clarify that I never met Agent Wesley Schwark and was never asked to view any six pack of photos in 2005. The only time I was questioned was in late 2009 by Agent James Mikkelson. It was in 2009 I was asked to identify a person in a six pack. I felt pressured to pick the person after Agent Mikkelson pointed to the photo.

Under the penalty of perjury this is true.

_____ Dated _9·24·20_

Ronisha Jessie

# CALIFORNIA NOTARIAL CERTIFICATE

## (JURAT)

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of _Los Angeles_

Subscribed and sworn to (or affirmed) before me on this _24th_ day of _September_, 20 _20_, by _Ronisha Jessie_, proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

Signature _____.    (Seal)



EXHIBIT I